[Malone v. Kelley et al.]

# Malone *v.* Kelley *et al.*

*Bill in Equity for Account and Settlement of Trust, &c.*

1. *Contract between parties not standing in fiduciary relation; what necessary to avoid; on whom burden of proof lies.*—Where no fiduciary relation exists between the parties, and they are of legal capacity, however disadvantageous or improvident a contract between them appears, a court of equity will not relieve against it, until the party seeking to avoid it, clearly proves that it was the result of fraud, mistake, surprise or undue influence practiced upon him.

2. *Same, contract between parties standing in fiduciary relation; when avoided; on whom burden rests of showing its fairness.*—Where, however, the legal relation of guardian and ward, trustee and *cestui que trust,* attorney and client, or any other relation in which confidence is reposed and accepted, or influence acquired, is shown to exist, the law on principles of public policy casts on him, to whom the confidence was extended or who has acquired influence, whenever he seeks a benefit under the contract, the burden of proving that he has dealt with the other party, exactly as a stranger would have done, taking no advantage of his influence or knowledge. putting the other party on his guard, bringing every thing to his knowledge which he himself knew—in short, the conduct of the guardian, trustee, attorney, &c., seeking to be benefitted by a contract or release, must be such as to sever the connection, and place him in the same circumstances in which a stranger would have stood, giving him no advantage, save only whatever of favor or kindness may have arisen out of the connection.

3. *Same; release not distinguishable from any other contract made between parties occupying fiduciary relations.*—A trust may be discharged and the trustee relieved from all liability for his administration of the trust estate, by a release executed by the *cestui que trust* who is fully *sui juris;* but such release can not be distinguished from any other contract or agreement into which a trustee and *cestui que trust* may enter, and when a trustee claims the benefit of it, he is bound to support it by the same measure of proof requisite to sustain any other contract he may have made with the *cestui que trust,* or person to whom he stands in a fiduciary relation.

4. *Same.*—In determining the validity of transactions between persons standing in confidential relations, it is always a material fact that the *cestui que trust* has had competent and independent advice from disinterested persons, or persons bound to him and freed from all influence the trustee could exercise—thereby the opportunity for the exercise of undue influence, for a violation of confidence, or for imposition, is lessened; but this will not relieve the trustee from the duty of making a full disclosure of facts.

5. *Release; what not ground for avoiding.*—A release and settlement between *cestui que trust* and trustee, is not vitiated, if otherwise valid, because the *cestui que trust's* affection and sympathy for the trustee, who was a blood relative, prompted the settlement; nor because the trustee, in the negotiations leading to the settlement, he then being impoverished, promised, if he became able in the future, to pay more.

6. *Cestui que trust; right of, where trust funds are used in business by trustee.*—Wherever a trustee uses funds of the trust estate in his own business or that of another, he will not be permitted to derive a profit therefrom, and the *cestui que trust* may elect either to take the profits or to insist on the corpus of the fund and interest, released from the loss or profit made in the business; the election, however, must cover the whole period the trust funds were employed in the one business; the *cestui que trust,* in general, can not take profits for one part of the time and interest for the other.

Vol. LIV.

[Malone v. Kelley et al.]

7. *Same; what will not excuse use of trust funds by trustee in his own business.*
Where the will of the testator, under which a trust arose, gives no power to
the trustee to use trust funds in a partnership, retaining all profits over inter-
est, the trustee can not claim profits or justify such use of the trust funds, by
oral proof that the funds were thus used in pursuance of verbal instructions
of the testator before his death.

APPEAL from Chancery Court of Mobile.

Heard before Hon. H. AUSTILL.

The bill in this case was filed by the appellees, Laura Kel-
ley and her husband, against the appellant, Malone, who
was trustee for said Laura under the will of her father, Drury
Malone, deceased, for an account and settlement of his trust,
and to vacate and annul a release she had given Malone.

The defense relied on was a release and settlement had with
the *cestui que trust* and her husband, shortly after she became
of age, upon which event the trust, by its terms, terminated.
This release was assailed by the appellees as obtained by
fraud and undue influence, and the evidence introduced was
mainly directed to that question. The evidence is volumin-
ous, and the substance of much of it is stated in the opinion.
It is only necessary here to set out the main facts of the case,
which were as follows:

Drury Malone, father of appellee, Laura, died in Mobile
in the year 1847, when she was about two years old, leaving
a large estate, which he devised to his widow and the appel-
lant, his brother, in trust for said Laura and her brother,
and empowered him, among other things, "to manage and
dispose of the property until they should respectively come
of age," as he deemed best. Drury Malone, at the time of
his death, was a commission merchant in Mobile, having
most of his estate invested in that business, and the appel-
lant succeeded him in the business. The executors probated
the will, and after settling the estate in the probate court a
considerable sum remained belonging to appellee, Laura,
which was delivered to appellant, who had it passed to his
credit on the firm books, and used it in that business, until
under the advice of counsel he invested the funds in Confed-
erate securities, in the year 1863 or 1864. Neither at the
date of the investment nor since that time, up to complain-
ant's reaching majority, were there any profits; for the re-
sults of the war had exhausted the capital and profits, or
reduced it to an inconsiderable sum, compared with what it
originally was. Although there were several changes in the
partnership during the period, the trust funds were used in
its business, there was no settlement of accounts and ascer-
tainment of profits and losses, and the business of the firm
continued substantially as though there had been no change
in its membership. The appellant introduced some oral

proof to show that he used the trust funds in the firm business in pursuance of directions from the testator, with the understanding that he was to have all profits above interest.

Appellee, Laura, after the death of her father, resided with her mother, and upon her marriage, with her mother and stepfather, until her own marriage with W. H. Kelly in 1863, at which time the family resided in Marengo county. In 1865 she returned to Mobile, where appellant lived, and upon asking money on account of the trust from appellant, he informed her of the loss of her fortune, by the investment in Confederate securities. After this she employed an able solicitor to look into the matter, and afterwards, on attaining her majority in May, 1866, he commenced negotiations with appellant for a settlement. Appellant furnished appellee's counsel an account, charging himself as trustee with all moneys received, and claiming various credits, including one for the amount invested in Confederate securities; as to the correctness of the account, save as to the investment in Confederate securities, there seems to have been no dispute. After consultation between the solicitors of the parties, it was agreed that $18,500 (about one-half of the amount claimed of appellant,) would be advised by them as the basis of settlement. Appellant, however, rejected this proposition. Appellee's solicitor was informed of this, and that Malone would go to see the appellee, Laura, who was then with her mother and stepfather at Sommerville, about three miles from Mobile, and endeavor to effect a settlement with her. The solicitor immediately informed appellee's husband, who sent a note forbidding the interview, but it had taken place before the note was received.

What took place at this interview is stated in the opinion, and after discussion about the matter, appellee agreed, verbally, to accept $2,000 in cash and Malone's note with sureties for $10,000 additional, payable in one and two years with interest, and promising to write him next day. On the third day she wrote Mr. Malone the following letter :

SOMMERVILLE, June 20th, 1866.

*My Dear Uncle*—I have reflected seriously on the conversation we had together on Monday. I have thought it would not be improper in me to suggest a slight change in the settlement of our matters. I wish you to understand, however, if you will not agree to the proposition I now make, your refusal will not affect the contract in the least.

I feel it my duty, as your niece, to be candid with you, and state to you freely and honestly my opinion. I have to propose that you pay the lawyer's fee, which will be quite large.

[Malone v. Kelley et al.]

It was the advice of my mother throughout to ask of you $15,000. You proposed $12,000, which I accepted. Can you not favor ma's [proposition] so far as to make good to me $12,000, and pay the lawyer's fee or provide me with means to pay it.

I now write to my attorney your proposition, and my consent thereto. I beg you, in the settlement with him, to provide the means, over twelve thousand dollars, to pay his fee.　　　　Your loving niece,　　　　L. E. KELLEY.

On the same day, she sent her counsel the following letter:

SOMMERVILLE, June 20th, 1866.

Dear Sir—My uncle, J. B. Malone, proposes to settle with me on the following terms: Twelve thousand dollars, secured to me in payment of $2,000 cash, and ten thousand dollars payable in one and two years, with interest, notes to be secured by two or more names. I accede to this, and request you to act accordingly. You might require the names of C. K. Foote and C. G. Richards, and any other name he may propose, though I will be satisfied with the above as security. Although I agreed to accept the proposition made by my uncle, yet I thought it but fair to request him to allow me a sufficiency to pay your fee, over and above $12,000. In the settlement with him make known this my request, and urge upon him the propriety and justice of this course. Perhaps he may be induced to grant my petition.

　　　　Respectfully,　　　　L. E. KELLEY.

P. S.—I can not send this without expressing, in a few words, my heartfelt thanks for the great interest you have taken in this matter, and only wish I had settled it with your entire approbation; but my heart, woman like, made me decide it hastily.　　　　Respectfully,　　　　L. E. KELLEY.

Malone yielded to the demand for the additional thousand dollars, and included the amount in the notes. Appellant's counsel drew up a receipt, which was examined by appellee's solicitor, who sent it to her, and it was returned signed by her and her husband, in the presence of two witnesses.

This agreement, or receipt, was as follows:

"Received of James B. Malone two thousand dollars in cash, and his two promissory notes, with Charles K. Foote and Charles G. Richards as securities, of even date with this receipt, one for six thousand eight hundred and eighty dollars, payable on or before the 20th day of June next, the other for five thousand four hundred dollars, payable on or before the 20th of June, 1868; each note payable to the undersigned William H. Kelley, jr., as trustee of his wife, the undersigned Laura E., and for her sole and separate use. Said payment

[Malone v. Kelley et al.]

and notes are in full satisfaction and compromise of all claims on said James B. Malone as trustee of said Laura E. under the will of her deceased father, Drury R. Malone, and after statement of his accounts by said James B. Malone, and full examination and understanding of the undersigned. No question has been made between the parties as to the items of the account, except as to the credits to said James B. Malone for investment in securities of the late Confederate States; and this has been settled and compromised by said James B. making the above payment, and giving the above notes in full settlement of his liability as trustee for the said Laura E. under the will of her said deceased father.

Given under our hands the 20th day of June, 1866."

The cash payment was made and notes executed, as therein recited, and these were paid at maturity. This bill was filed nearly eight years after the settlement was made. It is stated as a reason for not filing it earlier, that appellee relied on appellant's promise to pay more when able, and her husband would not sooner consent to join with her in the suit, and without his consent her solicitor refused to act in the matter.

The cause was submitted for final decree on bill, answer and proofs, and the chancellor rendered a decree annulling the release, granting the relief prayed, and directing a reference to the register to state the account. This decree is now assigned for error.

ROBERT H. SMITH, D. C. ANDERSON, and WATTS & WATTS, for appellant.—Whether Mrs. Kelley's estate was a statutory or an equitable estate, she could have sued independently of her husband or made him a defendant.—*Roper v. Roper*, 29 Ala. 247; 2 Brick. Dig. p. 86. Her husband's unwillingness to sue is no excuse for acquiescing in the settlement for so many years. "A man who, with full knowledge of the case, does not complain, but deals with his opponent as though he had no case against him, builds up, from day to day, a wall of protection for such opponent, which will probably defeat any future attack upon him."—2 Porter, 58; 5 Ala. 90; 17 Wallace, 78; 96 Eng. Com. Law, 148; 5 Beavan, 444.

II. The natural relation of the parties, as uncle and niece, and the peculiar history and nature of the debt, and the extent and liability of the trustee, made it a proper subject of settlement by compromise. It cannot be assumed with any show of reason or propriety, that the trustee ought to be held to the strictest and most rigid rules of liability. Such contracts and settlements are favored in our courts,—*Motley*

*v. Motley*, 45 Ala. 555; *Kirby v. Taylor*, 6 John. Ch. 242; *Billingslea v. Ware*, 32 Ala. 415.

III. The investment in Confederate money was really the only disputed question. The court once held that the trustee was not liable for an investment thus made.—*Watson v. State*, 40 Ala. 42.

The trustee did not conceal any thing from the appellee. She had eminent counsel. He was informed of all the facts, and from him appellee knew all her rights. With a full knowledge of them she voluntarily and deliberately made the settlement, without any undue influence, fraud or concealment on the part of the appellant, and cannot now be heard in a court of equity to deny force to her own intelligent and voluntary act.—*Uhlick v. Mulhke*, 61 Illinois, 499. After the employment of counsel, she stood in the relation of litigant " at arm's length " against appellant, (5 Ala. 90,) even if the fiduciary relation had not, before that time, ceased to exert any influence. The burden of proof rests on her to make out her case.—*Kirby v. Taylor*, 6 Johnson Ch. *supra*.

GOLDTHWAITE & TAYLOR, *contra*.—Appellee's estate was an equitable estate. It was created by will, taking effect in 1847.—*Hardy v. Boaz*, 29 Ala. 168; 19 Ala. 373.

II. If it be admitted appellant had a statutory estate, she could not be barred of her action in this case; express trusts, peculiarly the subjects of equitable jurisdiction, are not barred by the statute of limitations.—8 Porter, 211; 14 Ala. 315; 32 Ala. 314; 33 Ala. 357. The statute of limitations does not run against a married woman's equitable estate until she becomes *discovert*, and so long as the statute does not run, the staleness of the demand cannot prejudice her.— 6 Ala. 589; 2 Brickell's Dig. § 159.

III. Rules of public policy require such transactions as this, to be " scrutinized with a jealousy almost invincible." 9 Vesey, 297; 13 Vesey, 52; 18 Vesey, 126; Story's Eq. Vol. 1, § 317; Perry on Trusts, § 200; Kerr on Frauds, 177.

IV. The evidence shows that appellant did not, in the language of the authorities, place himself in the attitude of a stranger. He made no disclosure of his use of the trust funds in his business. He never made any settlement of the trust estate. Failing to accomplish his purpose with appellee's counsel, appellant hurriedly shifts the negotiations and pleads with the *cestui que trust* herself, in the absence of her husband, to release him from payment of the amount her counsel thought just, urging his ruin and poverty, promising to pay more when able, using the influence he had acquired to enlist appellee's feelings and sympathy to procure a set-

tlement, which, as her trustee, he should have left to be conducted by her attorney.

BRICKELL, C. J.—The bill was filed by the appellees, against the appellant, who was a trustee for the appellee, Laura E., under the will of her father, for an account and settlement of the trust.    The defense made by the appellant is, that in 1866, soon after the *cestui que trust* became of full age, which was the period appointed for the termination of the trust, there was an adjustment and settlement of his accounts, and a release executed by her and her husband, acknowledging full satisfaction, and discharging him from all further liability.    The release is impeached by the appellees, as having been obtained by fraud and undue influence, and the appellant affirms not only its fairness and validity, but its subsequent confirmation by the appellees, their acquiescence in it, and relies upon the lapse of time, and the statute of limitations, as constituting a bar to the relief sought.    Near eight years elapsed after the settlement was made, and the release executed, before the bill was filed, or any complaint made of the settlement, which was communicated to the appellant.    The money the appellant agreed to pay on the settlement, and in consideration of the release, was payable chiefly in two annual installments, and for these appellant made his promissory notes, with surety, which were payable to the appellee, William H., as trustee for his wife, and were paid to him as they became due.

Any contract or agreement into which a party is lured by fraud, or into which he is drawn by surprise or mistake, superinduced by the party with whom he contracts, or which is extorted by the undue influence of the party claiming the benefit of it, is vicious and will be annulled.    When no fiduciary relation exists between the parties, and they are of legal capacity, however improvident or disadvantageous the contract may appear, though marked by folly or indiscretion, it must stand until the party seeking to escape its obligation clearly proves that it was the result of fraud, mistake or surprise, or undue influence practiced upon him.—*Judge v. Wilkins*, 19 Ala. 765.    If, however, either of the known legal relations, of guardian and ward, trustee and *cestui que trust*, attorney and client, or any other relation, in which confidence is reposed and accepted, or influence acquired, exists between the parties, on him to whom the confidence is extended

NOTE.—This case was ably argued by counsel on both sides, who filed elaborate printed briefs.  As the briefs are mainly devoted to a discussion and statement of the evidence, it is not possible to condense them satisfactorily, and their length forbids their insertion *in extenso*.

and who has acquired the influence, if he claims the benefit of the contract, the law, on a principle of public policy, casts the duty of proving its fairness, and that it is untainted by a violation of the confidence reposed, or an undue exercise of the influence of the relation. The principle is thus stated by Lord Brougham, in *Hunter v. Atkyns*, 3 Myl. & Keene 135, (10 Eng. Ch. Rep.): "There are certain relations known to the law, as attorney, guardian, trustee, if a person standing in these relations to client, ward or *cestui que trust*, takes a gift, or makes a bargain, the proof lies upon him, that he has dealt with the other party, the client, ward, &c., exactly as a stranger would have done, taking no advantage of his influence or knowledge, putting the other party on his guard, bringing everything to his knowledge which he himself knew. In short, the rule, rightly considered, is, that the person standing in such relation, must, before he can take a gift, or even enter into a transaction, place himself exactly in the same position as a stranger would have been in, so that he may gain no other advantage whatever from his relation to the other party, beyond what may be the natural and unavoidable consequence arising out of the relation." Again, "in a word, standing in the relation in which he stands to the other party, the proof lies upon him, (whereas, in the case of a stranger it would lie on those who opposed him,) to show that he has placed himself in the position of a stranger, that he has cut off, as it were, the connection which bound him to the party giving or contracting, and that nothing has happened which might not have happened had no such connection subsisted." Again, "the rule cannot be laid down much more plainly than I have stated it, that when the known and defined relation of attorney and client, guardian and ward, trustee and *cestui que trust* exists, the conduct of the party benefitted must be such as to sever the connection, and to place him in the same circumstances in which a mere stranger would have stood, giving him no advantage save only whatever kindness or favor may have arisen out of the connection." The principle is thus stated by COLLIER, C. J., in *Juzan v. Toulmin*, 9 Ala. 684: "Where there is a peculiar relation of a confidential and fiduciary character, as principal and agent, trustee and *cestui que trust*, &c., to prevent the undue advantage which the situation of one of the parties gives him over the other, the law requires the utmost degree of good faith in all transactions between them. If, in such case, there is any misrepresentation or concealment of any material fact, or any just suspicion of artifice, or undue influence, courts of equity will interpose, and pronounce the transaction void, and so far as possible

restore the parties to their original rights." In *Johnson v. Johnson*, 5 Ala. 94, ORMOND, J., states the principle in these words: "Contracts made by persons, between whom the relation of trustee and *cestui que trust* exists, are viewed with so much jealousy by courts of chancery that they are voidable by the latter, if within a reasonable time he seeks to set the contract aside, and can be supported only when the trustee, previous to the contract, has made such a full disclosure of all the facts and circumstances which have come to his knowledge as trustee to the *cestui que trust*, as to enable the latter to deal on equal terms." Further, he says: "The superior knowledge of the subject of the contract, and the control which one of the parties has always been accustomed to exercise over the other, prevents that contestation between the parties which is the principal, if not the only, security against unfair dealing. In such cases, the parties do not meet on equal terms, and it is almost, if not quite, a matter of course to open the account, or set aside the contract, if seasonably applied for, even when there has been no fraud or circumvention, if a reasonable doubt exists of the justice of the account." The principle does not incapacitate parties standing in these relations from contracting. Transactions between them, or contracts into which they may enter, are not necessarily void or voidable. The doctrine of courts of equity is satisfied when it clearly appears the confidence reposed has not been betrayed, and the influence acquired has been "kept free from the taint of selfish interest."—Kerr on Fraud, 151.

A trust may be discharged, and the trustee relieved from all liability for his administration of the trust estate by a release executed by the *cestui que trust*, who is fully *sui juris*. Such release cannot be distinguished from any other contract or agreement into which trustee and *cestui que trust* may enter. If it is made soon after the expiration of the time appointed for the continuance of the trust, and immediately on the emancipation of the *cestui que trust* from the disability of infancy, as was the release now relied on, it will not be sustained, unless the trustee shows affirmatively that it was executed with full knowledge of all the circumstances, after sufficient deliberation and ample opportunity of investigating all the accounts and transactions connected with the trust. Hill on Trustees, 900; Perry on Trusts, § 851; 1 Story's Eq. (Redfield's Ed.) § 322 *a*; *Wedderburn v. Wedderburn*, 4 Myl. & Cr. 40 (18 Eng. Ch. Rep.); *Johnson v. Johnson*, 5 Ala. 90.

The facts of this case do not permit us to doubt that the settlement and release on which the appellant relies as a bar to the relief sought, must be supported. We do not concur

[Malone v. Kelley et al.]

with the counsel for the appellant in the proposition, that when they were entered into the relation of the parties had been changed from that of trustee and *cestui que trust* into that of threatening litigants. The trust was created when the *cestui que trust* was a mere infant, not two years of age, by the will of her father, the brother of the trustee. The manner and terms of its creation is the most satisfactory evidence of the unbounded confidence the testator had in the trustee. Though the *cestui que trust* resided with her mother, to whom her guardianship was committed, and the only personal intercourse between her and the trustee, was such as would be expected from their consanguinity, if no other relation had existed, it cannot be doubted that she bore to him all the affection springing from the natural ties by which they were bound, and reposed in him large trust and confidence. The letter signifying her acceptance of the settlement, now adduced as evidence that she freely and intelligently entered into the transaction, is clear evidence of her affection and trust. It could not have been written more delicately, affectionately and confidingly. Though, as it states, she has been advised by her mother to ask fifteen thousand dollars in satisfaction and compromise of the trustee's liabilities, he had proposed twelve thousand dollars, which she had determined to accept. As a favor to her, she suggests that in addition he pay the fee of her counsel, so that she may realize the whole sum he had offered, distinctly stating, however, that his refusal will not affect the agreement which had been proposed. Of her affection, and of the trust and confidence she reposed in him, the appellant had not then a doubt. When informed by one of his counsel that he had suggested the payment of eighteen thousand five hundred dollars in compromise and settlement, though negotiations had been for a month pending, and the subject of conference and discussion with their respective counsel, though up to that time he had sought no personal interview with her, and had been content to leave the matter with the counsel, declaring his inability to pay a sum so large ; he said "he would go out and see his niece about it." The evidence fully acquits him of seeking this interview for any improper purpose. It was not, as is suggested in the argument of counsel, sought clandestinely, but openly, with the knowledge of the counsel of the *cestui que trust*, who communicated the fact that it was intended to her husband, who (without the knowledge of the appellant) endeavored to prevent it by a note to his mother-in-law forbidding it, which was not received until the interview had partially occurred. Considering the appellant's age, his relationship, and the disinclina-

tion the husband had, up to this time, shown to take any active part in the settlement, no unfavorable inference should be indulged, because the husband was not directly informed of it, and invited to be present. Especially so, when the interview was to be had at the residence of the mother and step-father of the *cestui que trust*. We believe it was sought because the appellant, relying on the affection of his niece, and the confidence she reposed in him, supposed if she heard from his own lips the confessions of his ruined pecuniary condition, the distress and embarrassment in which litigation with her would involve him and his family, the avowals of his fidelity in the discharge of his duties as trustee, and the inevitable loss which had ensued, she would trust them, and they would appeal more powerfully to her affection than if merely reported to her by another. The affection and the trust of which he did not doubt, was, as is said by Lord Brougham, "the natural and unavoidable consequence arising out of the relation" in which he and the *cestui que trust* stood. Advantages will spring from such relations, and we would hesitate to say that it is the or spirit of the law to repress them. Sound policy, general utility, the prevention of fraud, and the abuse of the affection and confidence which is generously and unhesitatingly reposed, require that when advantages are obtained, it should clearly appear they were freely and intelligently accorded, and are "the mere natural, unavoidable consequences of the relation."

The interview was had, each party confiding and trusting in the other. The bill abounds with allegations in reference to it, in some respects directly contradicted, and in others unsupported by the evidence. The serious ill health of the *cestui que trust*, her prostrate or nervous condition, vehemence in the conversation with her, or with her mother in the conversation had with her, or the mother's earnest solicitations or active interference at that time in producing assent to the terms of adjustment proposed by appellant, are not shown, but rather negatived by the evidence. The relation in which the parties stood demanded from the appellant the utmost good faith, and the utmost truthfulness of statement. We cannot say that he was wanting in these, or, rather, we can affirm from the evidence that they characterized the interview, and his conduct immediately preceding and subsequent to it. He did plead and insist on the poverty to which the war had reduced him—his inability to meet so large a demand as accounting for the entire trust fund and the interest, and on his fidelity in the administration of the trust. He did insist on the legal validity of the investment in Con-

federate bonds, and did positively avow his purpose, if driven to the necessity, to resist all liability for such investment, and did declare that he had acted under the advice of counsel, and had and could procure good counsel to defend him. As evidence of his inclination to deal not only fairly, but even liberally and generously with his niece, he did say if he was able at any time in the future, he would pay her more than the sum then proposed. He proposed paying her ten thousand dollars in satisfaction of all claims upon him. She not manifesting a willingness to accept this sum, he proposed twelve thousand dollars, two thousand of which was to be paid in cash, and the remainder in two equal annual installments. The settlement was not then made, or finally agreed on, and the interview closed, with the understanding that she would, the next day, inform him of her final determination. The appellant did not urge hasty action, but left the *cestui que trust* free to deliberate on his proposition, with full opportunity to consult with her husband, her mother, who had already expressed gratification at the proposition and willingness to its acceptance, and with her step-father, with whom and under whose care she had resided since infancy. There was full opportunity, also, for consultation with her counsel, if desired, and the evidence shows before the settlement was concluded, and the release executed, and before there was any agreement of legal efficacy, there was such consultation, and there was advice from all these, which the *cestui que trust* had full and complete option to pursue if she had so elected. What occurred at the interview, if it had not been followed by the release, and the payments made in consideration of it, would not, if the parties had been mere strangers, not connected by a fiduciary relation, have been regarded as more than a mere proposition of compromise, to be finally accepted or rejected in the future, and not conclusive until the one had signified willingness to accept, and the other had complied with its terms. On this point, there is no material difference in the evidence of the *cestui que trust* and the trustee. She states their conversations, the several propositions, and the last proposition, and says : "I did promise to inform defendant by letter of my final determination." The trustee says : "She signified her willingness to accept this ; said she would write me next morning." It is material to keep in mind that this was the result of the interview—a mere proposition of adjustment made, which the *cestui que trust* had full opportunity to consider, and full opportunity to submit, and did submit to her counsel, to her husband, her mother, and her step-father. The proposition was the subject of consideration and discussion by the *cestui*

[Malone v. Kelley et al.]

*que trust*, her husband, her mother and her step-father, at their own home, in the absence of the trustee, freed from any influence he could exercise. It was communicated to her counsel, and he objected to its acceptance, expressing the conviction that the sum was inadequate, and that he could obtain at least six, if not eight thousand dollars more in compromise. They persisting in a purpose to accept it, (we mean *cestui que trust*, husband, mother, step-father,) he disclaims all responsibility for it, and without further interview or interference by appellant, it was accepted and consummated. The communications with the counsel were had by the mother or step-father, and the letters of the *cestui que trust* to the trustee, accepting the compromise proposed, and to her counsel, instructing him as to the mode in which it should be consummated, were borne by the one or the other. These letters were written with the knowledge, and without dissent from the husband, communicated to the trustee, or to the counsel, and it is now too late for him to say it was not with his approval. Before they were written, the *cestui que trust* was informed her counsel disapproved the acceptance of the proposition, and the reason of his disapprobation. The postscript of her letter to him clearly admits this. Thanking him for the interest he had taken in the matter, she regrets not having settled " with your entire approbation, but my heart, woman like, made me decide it hastily." She knew of his disapprobation, and apologizes for not following his advice. She was free to follow it, but preferred rather to obey the impulses of her heart. If she knew of his disapprobation, whoever informed her of it must, it is fair to presume, have also informed her of the reasons for it; that he regarded the sum as inadequate, and was convinced from his negotiations with the adverse counsel, a larger sum could be obtained. It cannot be supposed either her husband, her mother, or her step-father (from one of these she must have learned of her counsel's disapprobation) failed to inform her of the reasons for it. It was doubtless, as she says, her " woman's heart " sympathizing with a distressed uncle, who, by the calamities of the war, was reduced to poverty, that induced her into the compromise, and not, as is now alleged, any want of information as to the opinion and advice of her counsel. There is also evidence that during her minority she had expressed a preference for an investment of the trust funds in Confederate bonds, rather than in real estate. The expression of such preference then, cannot affect her legal rights, but the fact may have had a moral influence in determining her action.

Nor can it be said that the *cestui que trust* had not full

[Malone v. Kelley et al.]

information as to the accounts and transactions of the trustee. The bill does not aver any want of information, or that since the settlement was made and the release executed, any facts have come to the knowledge of the *cestui que trust* or of her husband which were not then known to them. With the exception of an allegation that the trustee had employed the trust funds "in highly profitable business investments, by means of which large sums of profit accrued to the principal," there is not a fact stated in the bill not fully known to all parties at and before the settlement and release—not one, which must not have been fully considered by the *cestui que trust*, her counsel and her confidential advisers. We speak of the state of the trust accounts and the transactions of the trustee. True, it is alleged, the trustee had not rendered to any court, or to the *cestui que trust*, or to her guardian, "any statement or account, either of the manner in which said trust fund had been used or invested, or what profits have accrued from the same." There was no court to which the trustee could have rendered any account, unless he had, prior to the termination of the trust, filed his bill in equity praying that court to take jurisdiction of the trust and direct him in its administration; or, after its termination, filed a bill for the settlement of his accounts. This last remedy was that which each party was seeking to avoid by the settlement which was made, and the first, however proper and more prudent for all parties in interest, is of such uncommon occurrence here in simple trusts, that no want of good faith can justly be imputed to a trustee who does not pursue it. It may be no account was submitted to the *cestui que trust* or to her guardian personally; yet, it is certainly true, one was submitted to her counsel. It is also true, that the *cestui que trust* was fully informed of this account and its items, and that by it the trustee charged himself with all moneys he had received, or with which even now it is proposed to charge him—that he charged himself with simple interest only, and claimed a credit for investment in Confederate bonds. Unless it is proposed to elect to charge him with the profits, if any realized from the use of the money in business, instead of interest, (which we will consider presently,) it is not suggested that this account did not embrace every item of charge against him. Nor, is it suggested, that he made claim for any credit, unless it be the investment in Confederate bonds, to which he is not justly entitled. The release executed by her and her husband, expressly recites that the settlement is made with the trustee "after statement of his accounts by said James B. Malone, and full examination and understanding of the same by the undersigned;" and further,

(35)

"no question has been made between the parties as to the items of the account, except as to credits to said James B. Malone, for investment in securities of the Confederate States, and this has been settled and compromised," &c. These recitals do not originate from, and are not to be regarded solely as the acts or expressions of the trustee. They do not appear to have been introduced at his suggestion or with his knowledge. The release was drawn by his counsel, but the draft of it was first submitted to the counsel of the *cestui que trust*, and by him examined and approved. It was then drawn and delivered to him, to procure execution by his clients, the *cestui que trust* and her husband. It was sent to them, and by them examined at their own residence, and it is but fair to infer, by the mother and step-father. It was then executed, the mother and step-father being the attesting witnesses, and returned to the counsel, by whom, on the consummation of the compromise, it was delivered. These recitals may be capable of explanation or contradiction, but there is a want of evidence in this case to disprove them. It is too much to indulge the supposition that they were either carelessly or improperly introduced, not speaking the truth, and that they escaped the observation of the counsel of the *cestui que trust*, her own observation, that of her husband, her step-father and mother. These recitals must be taken as true, and they are corroborated and confirmed by the weight of the evidence. Taking them as true, the trustee made a full statement of his accounts, (except as to the use of the trust funds in business,)—they were examined and deliberated upon by the *cestui que trust*, her husband, her mother and step-father, and her counsel, and after such examination and deliberation the settlement was made and the release executed.

It must not, in this connection, be overlooked, that the transaction was not the mere independent act of the *cestui que trust*. There was the intervention of counsel of her own selection, who was active and diligent in his inquiries as to her rights, and watchful of her interests. She had, also, the advice of her husband, her step-father and her mother. The mother and step-father had personal knowledge of many of the facts in reference to the trust estate, its amount and when received, and full opportunity of ascertaining every fact in reference to its administration, if they were not known to them. It is manifest, if the husband did not know the facts, it was the result of his indifference. In determining the validity of transactions between persons standing in confidential relations, it is always a material fact that the *cestui*

[Malone v. Kelley et al.]

*que trust* has had competent and independent advice from disinterested persons, or persons bound to him and freed from all influence the trustee could exercise. The transaction is thereby relieved of much of the suspicion the law would otherwise attach to it. The rule is thus stated by a recent writer: "If it can be shown to the satisfaction of the court that the other party," (the *cestui que trust,*) "had competent and disinterested or independent advice, or that he performed the act or entered into the transaction voluntarily, deliberately and advisedly, knowing its nature and effect, and that his consent was not obtained by means of the power of influence to which the relation gave rise, the transaction will be supported."—Kerr on Fraud, 151. The opportunity for the exercise of undue influence, for a violation of confidence, or for imposition, is lessened. The probability that the transaction proceeds only from the spontaniety of the *cestui que trust*, is increased. There must still rest, however, on the trustee, the duty of furnishing full information, so that the independent advice the *cestui que trust* may receive, may be intelligently given. This whole transaction bears traces of the advice given the *cestui que trust* and its influence. True, she did not follow the advice of her counsel, but that was of her own volition, without the knowledge of the trustee, and with the concurrence of her other advisers. She instructs her counsel, specially, as to the sureties she will accept. In giving this instruction, she must either have acted on advice or on her own unbiased judgment. If she had advice on the point, it must have been given by her husband, her step-father or her mother, for there is no intimation that it was given by counsel. The trustee had not suggested the sureties he could or would give. If in directing the persons who should be taken as sureties, the *cestui que trust* acted on the advice of others than the trustee, the just presumption is, such advice was not limited to that matter only, but pervaded the transaction. If she acted on her own judgment, it is evidence that she was not constrained by the influence of the relation.

It can not be doubted the settlement was induced, and the release procured, by the representations of the trustee as to his pecuniary condition. The evidence proves the truth of these representations and the causes producing his impoverished condition. There is but little if any conflict, in the evidence on this point. A witness for the appellees does testify that the partnership of which the trustee was a member, were doing a good business during 1866–7, were of good credit, and that he never heard of their compromising any of their debts. This may all be true of the partnership, and

yet, it may be true, that the trustee was embarrassed and individually insolvent. It may also be true, that though the trustee was embarrassed and hopelessly insolvent, if compelled to account for the trust fund, that he had credit based on his integrity and fidelity, and punctuality in keeping his engagements. Credit is not always based on capital, or the possession and ownership of property, but often on individual character. The credit of which the witness speaks, is not the credit of the trustee, but that of the partnership. This evidence can not be regarded as contradictory of the positive and unequivocal statement of the trustee and his partner, who must have either testified falsely, or truthfully declared facts, which they had means and opportunities of knowing certainly. That the *cestui que trust* was influenced by the trustee's representations of his poverty we do not doubt. That her affection for her uncle, and her sympathy for him, prompted her action in a large degree, can not be doubted. That it proceeded from these, in the absence of misrepresentation or advantage taken, does not vitiate the release.

Much stress has been laid on the vague and indefinite promise by the trustee, that he would, if able in the future, pay the *cestui que trust* more. This promise is too uncertain for us to suppose that it could have had any material influence in inducing the settlement. It is impossible to say the contingency has arisen for its performance, if it was of legal value. How much more was he to pay? One dollar, or one thousand, or ten thousand, would be a literal compliance. Who was to determine the sum which could satisfy it, the trustee, or the *cestui que trust?* No court can determine it, for the promise furnishes no basis on which a judgment could be founded. It can not be supposed the trustee was expected to pay the whole amount claimed, without regard to the investment in Confederate bonds. That would be to suppose he was seeking, and the *cestui que trust* was according only temporary ease, and the debt was in effect acknowledged, remaining suspended over him, to fall and crush him, if by his energy, industry and economy, aided by the confidence of his friends, he should improve his pecuniary condition. As a legal promise, because of its indefiniteness, it is without validity.—*Erwin v. Erwin*, 25 Ala. 236 ; *Hatton v. Landman*, 28 Ala. 138. We have previously said, we regard it·as intended and accepted as an expression only of the trustee's inclination to deal not only justly, but if he had ability, generously with the *cestui que trust.* If it was ever esteemed as a promise, compliance with it was had, doubtless, in, the con-

templation of the parties when the trustee, at the request of the *cestui que trust*, paid the fee of her counsel in addition to the sum he had proposed and she was willing to accept.

The testator, at his death, was a partner in the mercantile firm of Leavens & Malone. Immediately on his death the trustee succeeded to his place in the partnership, and the business was conducted without any interruption of its usual course. The estate of the testator consisted mainly of his interest in the partnership. As this interest was reduced to money, that part of it to which the trustee was entitled was passed to his credit on the books of the new firm and was continued in the firm business. The business was profitable, and though several changes in its membership occurred, the business was continued and was prosperous until the commencement of the late war, which operated a suspension of all regular business in this State. If the business could then have been closed, the investment of the trust funds in it would have proved safe, yielding larger profits than interest. The assets of the partnership consist entirely of debts due to it, which were almost entirely lost by the insolvency of the debtors, resulting from the war. It does not appear that the *cestui que trust* was, prior to the settlement, informed the trust funds had been used in the partnership business, nor was any statement furnished by the trustee showing the profits which had accrued from the use of the funds. The trustee seeks to excuse this use of the funds, by evidence that it was in accordance with verbal instructions and authority given by the testator; and that he accepted the trust on the expectation that he would be entitled to all profit above interest, which should be realized from this use. This may relieve the trustee from the imputation of wilfully imperiling the trust funds in trade instead of investing them permanently on safer security. It can not, however, legalize the act, or entitle him to the profits resulting from it. The will creates the trust—the law operating on it, defines the rights of the *cestui que trust*, and the duties and responsibilities of the trustee. It would be most dangerous to permit these varied by evidence not in writing, resting merely in parol, and known to the trustee only.

The unbending rule is, that a trustee's relation is one of duty and confidence, and not of profit to himself. From the use of the trust funds, if he makes profit, he must account for it to the *cestui que trust*. If in violation of his duty, he employs the trust funds in his own trade or that of another; the profits enure to the *cestui que trust*, and if the funds are lost the trustee is absolutely liable for them.—Perry on Trusts, § 429. The *cestui que trust* has an election in such

case, either to take the profits which may accrue, or to charge the trustee with interest.—*Kyle v. Barnett*, 17 Ala. 306.

If the facts presented a case for an election by the *cestui que trust*, either to take the investment made by the trustee or to charge him with the principal of the trust funds and interest, the settlement and release could not operate to bar this election. They could not so operate, because the trustee has not shown affirmatively that he furnished the *cestui que trust* the information on which she could have fairly and intelligently exercised her right of election. He did not furnish her any statement or account of the profits resulting from the use of the trust funds; though there had been a statement of facts from which she, or her counsel or her other advisers, could have ascertained that she had the right of election. Indeed, the bill disclosed the *cestui que trust*, her husband and her counsel, before the settlement and release, were fully informed of the manner in which the funds had been employed. But the facts do not disclose a case for an election. When that right exists, the *cestui que trust* must take either the profits or the interest, for the whole period of the investment or use of the trust funds. He can not, without special circumstances, have interest for one part of the time and profits for another.—Hill on Trustees, 572, (top p.); Perry on Trusts, § 473. The rule is thus stated, on the authority of *Heathcote v. Hulme*, 1 Jac. & Wal. 122, a case bearing, in its facts, a resemblance to this case. The intestate died having large capital employed in a cotton manufactory, in which there were several partners. His administratrix continued the business, and married. After her marriage her husband conducted the business for a time, when there was a dissolution of the partnership, some of the partners retiring and others introduced. For a part of the time the business was profitable, for a part the profits diminished. The question in the case was, whether the next of kin could elect to take profits up to the time the investment was certainly profitable, and interest subsequently, or whether they must elect to take the one or the other for the whole period? The Master of the Rolls said: "On general principles it is clear, that when an executor or administrator has embarked the property of the deceased in trade, whether in his own or in any other, he can not himself be permitted to derive any benefit from it. An option must be given to the *cestui que trust* either to take the profit he has made, or, on the other hand, to insist on their capital itself, and interest released from the loss or from the profits. This is established; but on the part of the plaintiffs no authority has been cited; and

[Malone v. Kelley et al.]

it is admitted there is none in support of the changeable rule, which they demand for the computation of the account. It is necessary, therefore, to consider it upon principle.

"First, supposing that no such notice of dissolution, as in this case, had been given, and that nothing had happened to make any break in the period during which the application of the capital to trade continued, could this demand have been made? I am of opinion it could not, and that the plaintiffs must make their election *utrum horum*, which rule of account, they will adopt, but that they can not proceed by both. After the whole period is over, they have a right to judge which mode of accounting will be most advantageous to them, and to that they must adhere.

"The reason why I think so is this: if the parties were at liberty to take interest for one part of the period and profits for another, this would not have been the first time that it would have been tried. The novelty of the demand alone is against it. But, besides this, it would be contrary to justice; for what is the principle of the option that is given? It is, that the party elects whether he will ratify the employment of his capital; whether he will say that it was properly applied to trade; if so, he may take the profit, but he must also be subject to the loss. If he has affirmed the act of the administratrix, and has assented to it, it follows of course that this must continue until something happens to put an end to that implied consent, which is supposed to have been given from the first."

This is but an application of the general principle on which courts of equity proceed, in decreeing an election between inconsistent or conflicting rights. If the right arises out of a devise or bequest, or from any instrument, the party must elect to take either under the instrument or against it—he can not accept it in part, and reject it in part.—1 Lead. Cases in Eq. 303. The investment in trade of the trust funds, made by the trustee in this case, was continuous and unbroken from the day they were passed to his credit on the books of the firm of Leavens & Malone until their withdrawal and investment in Confederate bonds in 1863 and 1864. There was no change in the character of the business. There were changes in the membership of the firm, but there was no settlement of accounts, and ascertainment of profits and losses—a partner retired, or a dissolution resulted by operation of law, and another partner was introduced, the business continued substantially as if no change of membership had occurred. The right of the *cestui que trust* to take the profits from the use of the trust funds, was a right to take for the whole period of investment, not

for any part of it; a right to take them either up to the time of the investment in Confederate bonds, or up to her majority, in May, 1866. It is not material at which of these periods her right accrued, for, according to the evidence, at neither period were there profits. The insolvency of the debtors of the partnership, caused by the war, had exhausted profits and capital, or reduced the capital to an inconsiderable sum, compared with what it was originally. No good purpose could have been accomplished by a statement of the profits which had been made of the trust funds. Unless gross folly could be imputed to the *cestui que trust*, which would cloud any transaction had with her, such statement would have compelled her to insist on a settlement on the basis of principal and interest of the trust funds, and she had full information of every fact necessary to a fair and deliberate settlement on that basis.

We must be ready to declare that trustee and *cestui que trust*, may not by a compromise of disputed questions, adjust and settle the liabilities of the trustee, and that he can not be discharged from liability by a release voluntarily and intelligently executed, or we must hold the settlement and release in this case valid, barring the *cestui que trust* from a right to further accounting.

A consideration of the other questions argued by counsel is unnecessary. Regarding the release as valid, and a bar to the suit, it follows, the decree of the chancellor is erroneous, and must be reversed, and a decree here rendered, dismissing the bills, original and amended, and the appellees must pay the costs of this court, and of the court of chancery.

MANNING, J., not sitting.