# Kyle *v.* Perdue.

*Bill in Equity for Foreclosure of Mortgage, or Deed of Trust;*
*Cross-Bill for Cancellation of Conveyance.*

| 95 | 579 |
| 106 | 588 |
| 95 | 579 |
| 135 | 305 |
| 95 | 579 |
| f141 | 175 |

1. *Transactions between parties occupying fiduciary relations towards each other.*—The general principle which a court of equity applies to transactions between persons occupying fiduciary relations towards each other, is not confined to cases in which there is any formal or technical fiduciary relation, such as guardian and ward, parent and child, client and attorney, &c., but extends to all cases in which confidence is reposed by one party in the other, and the trust is accepted, under circumstances which show that the confidence was founded on the intimate personal and business relations existing between the parties, which gave the other party an advantage or superiority; and in such cases, the *onus* is on the party in whom the confidence is reposed to show that no fraud, undue influence, or other improper motive entered into the transaction, but that it was the voluntary act of the other party, fully understood by him, and his understanding of it fully expressed in the writings which he signed.

2. *Same; case at bar; conveyance cancelled.*—In this case, the instrument assailed by the grantor, an old woman in feeble health, by which she conveyed all her property to the grantees, wealthy men engaged in active business pursuits, in trust that they should take charge of the property, collect the rents, make necessary repairs, pay taxes out of the rents collected, and pay the residue to the grantor during her life, was set aside and cancelled at her instance, on evidence showing that, although they had not solicited her to make any conveyance of her property to them, they were her intimate friends, whom she consulted in all business affairs, and who represented to her, at the time when she signed the conveyance, that it bound them to support and maintain her during life, while in fact it only bound them to apply the surplus income of her own property, after payment of repairs and taxes, to her support.

3. *Same; ratification.*—When the grantor in a written instrument, which conveys all her property to the grantees in trust, partly, for her support and maintenance, files a bill to set it aside, her receipt of money for her support from the grantees, pending the suit, does not conclude her as a ratification of the instrument, when it appears that her necessitous circumstances compelled the acceptance of the money, one of her receipts stating, "I take this money because I am starving."

FROM the Chancery Court of Etowah.

Heard before the Hon. S. K. McSPADDEN.

The original bill in this case was filed on the 8th February, 1887, by Wm. H. Denson as trustee, and R. B. Kyle and Sam. Henry, claiming to be the owners and beneficiaries, and sought to foreclose a mortgage, or deed of trust in the

[Kyle v. Perdue.]

nature of a mortgage, which Daniel Liddell and wife had executed to secure a debt due to W. J. Perdue. Said W. J. Perdue died before the filing of the bill, having devised and bequeathed all of his property to his wife, Mrs. Augusta E. Perdue; and she was made a defendant to the bill. Kyle and Henry claimed to be the owners of the mortgage under a conveyance executed to them by Mrs. Perdue, which was made an exhibit to the bill; and Denson, the trustee, filed the bill at their instance, and in their interest. Liddell and wife made no defense, and a decree *pro confesso* was entered against them by consent. After the reversal and remandment on the former appeal (87 Ala. 423–30), Mrs. Perdue filed an answer and cross-bill, assailing the validity of her conveyance to Kyle and Henry, and asking its cancellation. Said conveyance was in these words :

"State of Alabama, Etowah County : This indenture, made this 9th day of August, 1886, between Augusta E. Perdue, of the State and county aforesaid, of the first part, and R. B. Kyle and Sam. Henry, of said county and State, of the second part, *witnesseth*, that whereas the said Augusta E. Perdue, being in feeble health, but of sound mind, and unable to look after and care for her property, and being desirous of having her property cared for during her natural life, and to make provision for her comfort and welfare during her natural life, and for the further purpose of disposing of my property, real, personal and mixed, and having the utmost confidence in my friends, R. B. Kyle and Sam. Henry ; now, therefore, in consideration of the sum of one dollar in hand paid by the said R. B. Kyle and Sam. Henry, the receipt of which is hereby acknowledged, hath this day bargained, sold, released, conveyed and confirmed, and by these presents doth bargain, sell, release, convey and confirm, unto the said R. B. Kyle and Sam. Henry, all my property, real, personal, and mixed, together with the tenements, hereditaments, and appurtenances thereunto belonging, and the reversions, remainder, rents, issues and profits thereof ; also, all the estate, right, title, interest, claim and demand whatsoever of the said party of the first part, in the above described property ; to have and to hold, unto the said R. B. Kyle and Sam. Henry, and their assigns forever ; in trust nevertheless, and upon the uses and purposes hereinafter mentioned, namely, first, to take charge of said property, take, collect and receive the rents, issues and profits thereof, and out of the proceeds to keep the said premises in good order and repair, and to pay all charges, taxes and assessments that may be imposed thereon, and pay the residue to

[Kyle v. Perdue.]

Augusta E. Perdue during her life. And the said Augusta E. Perdue *do* by these presents hereby stipulate, and it is hereby understood, that at and after the death of the said Augusta E. Perdue, the property above mentioned shall revert to the said R. B. Kyle and Sam. Henry, in fee simple, and in equal shares ; and for and in consideration of valuable services rendered to me by the said R. B. Kyle and Sam. Henry, and the further sum of one dollar to me in hand paid, the receipt of which is hereby acknowledged, I do hereby grant, bargain, sell and convey to the said R. B. Kyle and Sam. Henry all my property, real, personal or mixed, that I may die seized or possessed, together with all the tenements, hereditaments, and appurtenances thereto belonging; to have and to hold to the said R. B. Kyle and Sam. Henry, in equal shares, and to their assigns forever, less one-eighth of an acre each to be given to Ellen Anderson and Bookie Whorton. And the said R. B. Kyle and Sam. Henry are charged with the duty of, and are hereby fully authorized to lay off to Ella Anderson one-eighth of an acre of land, including the building now occupied by her, and one-eighth of an acre of land to Bookie Whorton, including the building now occupied by her, and to execute deeds in fee simple to each of them for said land ; and I hereby revoke all other arrangements, either verbal or written, as to the disposition of my prpoerty. In witness whereof, I have hereunto set my hand and seal, the day and date above written. Erasures on the 19th and 20th lines of second page made before signing." (Signed by Mrs. Perdue, under seal, attested by two subscribing witnesses, and admitted to record as a deed, December 7th, 1886, on proof by one of the subscribing witnesses.)

On final hearing on pleadings and proof, the chancellor dismissed the original bill, and rendered a decree for Mrs. Perdue under her cross-bill, setting aside the conveyance to Kyle and Henry. They appeal from this decree, and assign it as error.

WM. H. DENSON, for appellants. (No briefs on file.)

DORTCH & MARTIN, and A. E. GOODHUE, *contra.*

WALKER, J.—The original bill in this case was filed for the foreclosure of a mortgage, the ownership of which was claimed by the appellants, R. B. Kyle and Sam. Henry, under a certain instrument alleged by them to have been executed by Mrs. Augusta E. Perdue on the 9th day of

August, 1886. The case was in this court at a former term, on appeal from a decree sustaining demurrers to the bill. It was then held that, so far as the title to the mortgage and the right to sue on it were concerned, the instrument was not testamentary in character, but operated as a deed. It was decided that the demurrers had been improperly sustained.—*Kyle v. Perdue*, 87 Ala. 423. After the remandment of the cause, Mrs. Perdue interposed an answer and cross-bill, wherein she denied the rights set up by Kyle and Henry under the instrument of August 9, 1886, and asked that it be cancelled, on the grounds (1) that her signature to it was made at a time when she was physically and mentally incapable of transacting business of any kind, so that in signing the instrument she knew nothing of its contents or of its import; and (2) that in the alleged execution of said instrument she did not act freely and understandingly, but that her signature to the same was procured by the fraud and undue influence of Kyle and Henry who had long been her confidential friends and business advisers and as such had great influence over her which they abused by getting her to convey all her property to them at a time when she was prostrated by a serious illness and when she did not understand the terms or effect of the instrument which she signed. That instrument can not stand if either of the above mentioned grounds of attack upon it is sustained by the evidence.

The testimony of several witnesses, whose credibility does not seem to be affected by any improper bias, tends strongly to show that on the 9th of August, 1886, Mrs. Perdue was in no condition, mentally or physically, to attend to the disposition of her property. Two colored women who waited on Mrs. Perdue during her sickness describe her condition at and about the time the paper was signed as one of extreme illness. It appears from their testimony that she was physically helpless, was out of her head, and was unable to transact any business. Mrs. Hosmer, who was a near neighbor of Mrs. Perdue and was present when the instrument in question was signed, describes her as completely prostrated mentally and physically at that time, and says that her mind was not then strong enough to enable her to know and understand the business she was engaged in. Mr. Mower, a minister of the Protestant Episcopal Church, states that he had known Mrs. Perdue since 1850, and was for many years a friend of her deceased husband, who was a minister of the same church. He testifies that as minister he called to see Mrs. Perdue on the day the paper was signed,

and that at that time her mind was seriously impaired, and that she was neither mentally nor bodily in a condition to attend to any business relating to the disposal of her property. Mr. Dortch, an attorney, states that on Sunday, the 8th of August, 1886, he was asked by R. B. Kyle to go to Mrs. Perdue's residence, Kyle stating that Mrs. Perdue wanted to dispose of her property and wished the witness to draw the papers. Mrs. Perdue was found in·a condition of such prostration that the business was posponed until next day. On the next morning Mr. Kyle again asked the witness to go to Mrs. Perdue's residence. The witness refused to go, at the same time telling Mr. Kyle that he had determined not·to go back there as it·was his judgment and opinion that Mrs. Perdue was unable to dispose of her property, and that he would have nothing to do with drawing the papers. There was other evidence to support the allegation that Mrs. Pedue was at that time physically and mentally unfit to attempt the transaction of business. On the other hand, the witnesses introduced by the defendants to the cross-bill, including the physician who regularly attended upon Mrs. Perdue during her sickness, stated that she was competent to transact business and that she was able to understand the instrument when she signed it. We are thus confronted with irreconcilable conflicts in the testimony upon the issue as to Mrs. Perdue's mental competency at that time.

In considering the evidence bearing upon the charge that Mrs. Perdue, in signing the instrument, was unduly influenced by Kyle and Henry who abused the confidence which she reposed in them as her trusted friends and business advisers, it is material to ascertain at the outset the truth as to the relations existing between the parties. Kyle and Henry admit that they were on terms of intimate friendship with Mrs. Perdue, but deny that they occupied toward her any relation of special trust or confidence. From their own account of this matter the following state of facts is disclosed: Kyle and Henry were men of wealth actively engaged in business pursuits. For many years prior to his death they were intimate personal friends of Dr. Perdue who was a clergyman and a school-teacher. He frequently advised with them as to his business affairs. His means were invested in a residence in Gadsden, in railroad stocks and bonds, and in notes and mortgages. He had no children, and bequeathed all his property to his wife. A few weeks before his death he told Mr. Henry that he wanted him to look after and care for his wife. This conversation

[Kyle v. Perdue.]

Henry repeated to Mrs. Perdue after her husband's death. After she became a widow both Henry and Kyle frequently advised her in regard to her business affairs. She had such confidence in them that she requested them to use money she had on hand and pay her interest on it, as she preferred that disposition of it to any other investment. To satisfy her each of them accepted some of her money in this way, giving their notes and paying the interest as accrued. The box containing her valuables was kept in Mr. Henry's vault. He attended to getting the securities which her husband had left her transferred to her name and looked after collections for her. She was an old woman, and it is plain that she regarded Kyle and Henry as her trusted friends, and that she was in the habit of applying to them for advice in all business matters or troubles, and that they advised and assisted her whenever the occasion to do so was afforded. She had been quite ill for several weeks when, on August 8th, 1885, Mr. Kyle called to see her in response to a message to the effect that she wished to see him on business. When he entered her room she said that she wanted to see him about her business. In the course of the conversation she said that she was very sick and wanted to arrange her business before she got worse. She did not on that occasion state what disposition she wished to make of her property, but requested Mr. Kyle to bring Mr. Dortch to draw the papers. Kyle returned with Mr. Dortch during the afternoon of that day. At that time Mrs. Perdue was greatly prostrated and stated that she was unable to attend to the business. She requested Mr. Kyle to bring Mr. Henry with him when he came again. Henry states that on the morning of August 9, Kyle said to him that Mrs. Purdue wished them to come to her house, that she wanted to make some disposition of her property. They accordingly went to her house that morning. Mr. Dortch having refused to go with them they decided to take another attorney. The attorney who accompanied them had never spoken to Mrs. Perdue before that day. When her attention was called to his presence and he spoke to her she asked him if he was a lawyer. Both Kyle and Henry say that when they went to Mrs. Perdue's residence that morning they did not know what disposition she proposed to make of her property. From their own version of the circumstances attending their visit it is plain that they understood that Mrs. Perdue wished to make some disposition of her property and that she desired them to be present to see that the business was properly attended to. Mr. Henry says that when the instrument which she

signed was read over to her she asked him if it was right. She sought and relied upon his advice as she had often done before. In considering the transaction then had between Mrs. Perdue on the one hand and Kyle and Henry on the other, due regard should be had to their attitude towards her as shown by their previous relations with her and by the circumstances which led to their presence in her house on that occasion.

There are well established rules to be applied in passing upon transactions between persons whose relations are such as to suggest that in dealings between them confidence is reposed and accepted to such an extent that one of them is subject to the influence or ascendency of the other. When such a relationship is shown to exist if the one who was in a position to exert the influence claims the benefit of a contract with the person bestowing the confidence, the burden is cast upon the former to show affirmatively that the influence of his position was not unduly exerted, that the utmost good faith was exercised, and that all was fair, open, voluntary and well understood. This rule as to the burden of proof is of familiar application to contracts by which benefits are conferred by a *cestui que trust* upon his trustee, by a ward upon his guardian, by a child upon his parent, by a client upon his attorney, by a patient upon his physician, or by any one upon his priest or spiritual adviser.—*Noble v. Moses*, 81 Ala. 530; *Dickinson v. Bradford*, 59 Ala. 581; *Malone v. Kelly*, 54 Ala. 532; *Boney v. Hollingsworth*, 23 Ala. 690; *Johnson v. Johnson*, 5 Ala. 94; *Marx v. McGlynn*, 88 N. Y. 357; *Huguenin v. Baseley*, 2 Leading Cas. in Eq., (W. & T.) 1156. The relations here mentioned are but instances in which the principle is applicable. It is not essential that any formal or technical relationship of a fiduciary character has been established between the parties. It suffices that they stand in such a relation to each other that, while it continues, confidence is justifiably reposed by one, and the influence which naturally grows out of that confidence is possessed by the other. When the parties are merely friends of each other and deal upon terms of equality, the burden of showing the invalidity of any transaction between them is upon the one who assails it. But where their situation is such that as a matter of fact confidence is reposed on one side and there is superiority on the other side resulting from the influence acquired by the acceptance of the confidence bestowed, there is a presumption of undue influence to be rebutted by the superior party. Transactions between such persons may be entirely valid, but the

[Kyle v. Perdue.]

one who is in a position to influence the other must show that the duty which he assumed by the acceptance of the confidence has been fully performed.—*Voltz v. Voltz*, 75 Ala. 555; *Shipman v. Furniss*, 69 Ala. 555; *Waddell v. Lanier*, 62 Ala. 347; *Ferguson v. Lowery*, 54 Ala. 510; *Cowee v. Cornell*, 75 N. Y. 99; *Billage v. Southee*, 9 Hare, 534; *Tate v. Williamson*, L. R. 2 Ch. 55; Kerr on Fraud and Mistake, (Bump's Ed.) 183; 2 Pomeroy's Eq. Juris., §§ 956, 963; 8 Amer. & Eng. Ency. of Law, 647-654.

In the present case it appears from the testimony of the beneficiaries in the instrument which is assailed that the grantor therein had long been in the habit of seeking and relying upon their advice and assistance in reference to her business affiairs; that the circumstances leading to their visit to her on the occasion when the instrument was signed were such as to make it plain that she looked to them to see that the disposition of her property which she desired was properly made; and that by the arrangement which she then suggested and to which they fully assented they formally assumed the position of trustees of all her property with powers implying her unlimited confidence in their fidelity to her interests. It does not often happen that any of the familiar relations of a fiduciary character between adults beget in fact more of trust and confidence than the statements of Messrs. Kyle and Henry show that they were the recipients of on the occasion in question. We are satisfied that it is incumbent upon them to show that Mrs. Perdue signed the instrument voluntarily, deliberately and advisedly, with full knowledge of its nature and effect; that there was an absence of all undue influence, advantage, or imposition; and that they did not in any way mislead her as to the meaning or operation of the paper prepared for her signature.—*Balkum v. Breare*, 48 Ala. 75; *Jackson v. Harris*, 66 Ala. 565; *Haydock v. Haydock*, 34 N. J. Eq. 570; *Gillespie v. Holland*, 48 Am. R. 1; *Baker v. Monk*, 4 DeG., J. & S. 388, and authorities cited *supra*.

Mr. Kyle states that Mrs. Perdue said to Mr. Henry: "I wanted to see you and Col. Kyle about the disposal of my property. They want me to give it to the church, but I do not want to do it. I know what I want to do with it. I want you and Col. Kyle to take charge of all my property and take care of me while I live, and when I die I want you to pay all my debts, if any, and put a tomb-stone like the one over my dear husband's grave over my grave, and then I want the balance of my property divided equally between you and Col. Kyle, reserving to Bookie and Zeebie the lots

set apart to them. Can I do it? Col. Henry replied very promptly, 'You certainly can, madam, if you desire to do it.' " Henry says: "When I went into her room I went up to her bed. I asked her how she felt. After answering me she told me that she had sent for Mr. Kyle and me, that she wanted to give him and me everything she had in trust. That we were to look after her business and attend to her business. I wont be certain what other words she used. She said that she wanted to give it to me and Kyle square out, the property to be held by us during her life in trust for her support. This is all that I recollect now that she said before the paper was written." As to what occurred when the paper was signed, he says: "Capt. Cunningham read over the paper to her. She remarked that she wanted to give Kyle and me the property in trust. She seemed not to have grasped the idea of its being given in trust in the paper. It was then re-read to her. She then asked me if that was right, and I told her if what she told me just before the paper was written was right, it was. She then took pen in hand as above stated;" and also, in reply to an inquiry as to what explanation was made by Cunningham: "The explanation given by him was that she gave her property to Kyle and Henry, but that they were to have it for her support." Henry called to see Mrs. Perdue after her recovery and she then asked him as to the contents of the instrument which she had signed during her illness. He testifies: "I told her that in the paper she had given everything she had to Kyle and me. That we were to look after her and support her and have the property in trust for that purpose, and that in the paper she authorized us to make a deed each to Bookie and Zeebie of an eighth of an acre each with the houses where they lived. She asked me then if the interest on her papers would not support her, or if she was to get sick again, how was she to be provided for? I told her that it was Kyle's and my duty under the deed to take care of her and support her." It is plain from the testimony of both Kyle and Henry that they understood that, by accepting the benefit of the instrument, they became bound to provide for the support of Mrs. Perdue during her life, without regard to the sufficiency of the income to be received by them from her property. They are careful to state that the money and supplies which they have furnished her were from their own means and were not derived from the trust estate.

The instrument which was signed by Mrs. Perdue does not provide for such a disposition of her property as the.

statements of Kyle and Henry show was proposed and was understood to be effected. There is nothing in the instrument to impose upon the grantees any duty to care for or support the grantor during her life ; they are only required to pay her so much of the income from the property as may be left after deducting all expenses for repairs and for all charges, taxes and assessments. No .provision is made for the payment of the grantor's debts, or for the erection of a tomb-stone over her grave. The trust for her support during her life does not extend to the property conveyed but only to the income therefrom. Yet the trustees do not intimate that they understood that her claim upon the trust estate for a support was to be limited to the income. That, however, is the extent of the provision in her favor. The effect of the instrument which was prepared and signed is that Mrs. Perdue strips herself of all beneficial interest in her property except as to the net income therefrom during her life, and that the grantees do not undertake to contribute one cent to her support either from their own means or from the corpus of the trust estate. If Mrs. Perdue signed the instrument on Henry's assurance that it was right and that it conformed to her directions, it is plain that she acted under an entire misapprehension of its real meaning and effect. A comparison of the contents of the instrument with the statements by Kyle and Henry as to what was proposed and understood leads inevitably to the conclusion that in signing the instrument Mrs. Perdue did not understand its contents. Henry's own statement shows that he misled her, whether he intended to do so or not. The grantees acquired greater benefits than were intended to be conferred, and they did not assume the obligations to which they consented. The disposition of property which Messrs. Kyle and Henry say Mrs. Perdue expressed a desire to make was not effected by the instrument which she signed after being assured by Henry that the paper conformed to her directions. If that instrument is allowed to stand the grantees thereby acquire all of the grantor's property of every description without becoming liable to secure to her the substantial advantages which were contemplated to be provided for in her favor by the arrangement which was proposed. The testimony of the grantees themselves shows that the grantor never intended to make such a disposition of her property as is embodied in the instrument which she signed. In view of the relations of trust and confidence existing between the parties, and of the evident reliance by the grantor on the false assurances of one of the grantees,

[Thornton v. Tison.]

an instrument, the provisions of which fall so far short of the grantor's understanding of its operation in her favor can not prevail against her impeachment of it. The result is that, accepting the version of the transaction as detailed by the parties who assert its validity, it must upon their own statements be pronounced invalid. It is, therefore, unnecessary to pass upon the conflicts in the testimony upon the issue as to Mrs. Perdue's mental competency at the time she signed the instrument.

It is urged that by accepting money and supplies from Kyle and Henry Mrs. Perdue ratified the invalid instrument. It is plain that she had no intention to ratify it. She was asserting its invalidity in the courts. Her adversaries, by the active assertion of their claim, had succeeded in cutting her off from the enjoyment of the income from her property. She received their contributions toward her support during the pendency of this suit, and while she was under the stress of want, caused by the withdrawal of her accustomed means of livelihood. On one of the receipts which was presented for her signature she wrote, "I take this money because I am starving." Receipts given in such circumstances are entitled to no weight as evidence of a free consent to confirm the voidable transaction. The evidence by no means shows that the alleged acts of ratification were free, voluntary and well understood.—*Voltz v. Voltz*, 75 Ala. 567; *Thompson v. Lee*, 31 Ala. 292; *Butler v. Haskell*, 4 Dessau. (S. C.) 651; 2 Pom. Eq. Jur., § 964.

We discover no error of injury to the appellants in the decree of the Chancery Court.

Affirmed.