## HATTON *vs.* LANDMAN ET AL.

28  127
93  142

28  127
117  431

[BILL IN EQUITY TO ESTABLISH BY PAROL RELULTING TRUST IN LANDS.]

1. *Resulting trust founded on presumed intention, and not raised between parent and child.*—The resulting trust which, in equity, arises in favor of the person who advances the purchase money of land, is founded upon presumptive intention, and is designed to carry that intention into effect. It will not be created in opposition to the declarations of the person who advances the money, nor in opposition to the obvious purpose and design of the transaction. The mere fact that the purchase money was advanced by a parent, while the conveyance was taken in the name of a child who is not shown to be provided for, is not sufficient to raise the presumption of such a trust.

2. *Evidence in this case held insufficient.*—Bill filed by two sisters, against widow and devisee of deceased brother, to establish resulting trust in lands purchased by decedent in his own name, but paid for with money advanced by his mother. The complainants were all of lawful age when the purchase was made; the bill was not filed until after the expiration of more than sixteen years from the purchase, more than nine years after the death of the old lady, and more than three years after the death of the son; and the only excuse alleged for the delay was disproved. The complainants' evidence consisted principally of the old lady's declarations, made in her son's presence, that her money had paid for the land; the son's admissions of that fact; and his promise to his mother that he would "do what was right between his sisters, after she was gone, in relation to the land." The other evidence in the cause showed that the son lived with his mother, and managed her business, for six or seven years before the purchase was made, and from that time until her death; that his services to her, for which he was not shown to have received any compensation, were worth more than the price of the land; that he was an economical and industrious man; and that his mother knew, several years before her death, that he claimed the land as his own. The court refused to establish the trust; holding that the declarations of the parties were reconcilable with the non-existence of the trust, or with its waiver and discharge before the old lady's death, and that the evidence, under all the circumstances of the case, was not sufficient.

APPEAL from the Chancery Court of Madison.

Heard before the Hon. E. D. TOWNES.

THIS bill was filed by James Landman and Julia, his wife, and John M. Lynch and Nancy, his wife, against Mary A. W. Hatton, the widow and devisee of James Hatton, deceased, and Edmund Toney; and its object was to establish

and enforce, for complainants' benefit, a resulting trust [in certain lands, alleged to have been purchased by said James Hatton, and to have been paid for with money advanced by his mother. The substantial allegations of the bill are as follows :

That, for several years prior to 1834, James Hatton was the agent of his mother, Frances Hatton, in the management of her business, and as such agent sold her crops, received the proceeds, and paid it out for her; that in 1834, Samuel Hatton, another son of said Frances, agreed to sell to his mother a certain quarter-section of land, (the S. E. quarter of section four, township five, range two west,) for $1,000, "but, finding his wife unwilling to join in a conveyance of it to his mother, agreed with said James, that he would make the deed of conveyance to him, for the use and benefit of his mother; that accordingly said Samuel and wife did make their deed, dated February 11, 1834, whereby they conveyed said quarter-section of land to said James, for which said James paid him $1,000"; that the consideration is expressed in said deed to have been $2,000, because said Samuel's wife was unwilling to sell said land for a less sum. " Complainants have been informed, believe it to be true, and so charge, that the $1,000, so by said James to said Samuel paid for said land, was in fact the money of said Frances, and that said land was so purchased by him for her." The bill also alleges, that said James, about the ————, purchased from one John Hatton another tract of land, containing eighty acres, but how much he paid for it complainants do not know; "and complainants have been further informed, believe it to be true, and so charge, that said James bought this land, and paid for it, with the money of said Frances, and for her use and benefit, but took the evidence of title in his own name."

It is further alleged, that said Frances died in September, 1841, after having in July, 1838, made and published her last will and testament, by which she disposed of most her property in specific legacies to complainants, Julia and Nancy and said James, who were her children, but neither of said tracts of land was included in either of said legacies; that said Julia, Nancy and James were also appointed residuary

legatees; that said James afterwards died, in March, 1847, having made and published his last will and testament, by. which he gave all his property to his said wife Mary. It is further alleged that said James, immediately after the death of his mother, took possession of both of said tracts of land, and claimed them as his own ; that upon his death, his widow also took possession of them, and has since sold them to said Edmund Toney, who is also made a defendant to the bill. It is also alleged, that Nancy was married to John M. Lynch after the death of said Frances Hatton.

The answer of Toney sets up his purchase, *bona fide* and for valuable consideration, without notice of complainant's alleged claim, and denies, on information and belief, the trust charged in the bill. Mrs. Hatton, also, in her answer, denies all the allegations of the bill, on information and belief, in relation to the trust. The statute of non-claim, and other matters which it is unnecessary to notice, are pleaded in bar of the relief sought.

On the part of the complainants, the following witnesses were examined : R. A. Jamar, Wm. Acklen, Robertson Brewer, and Nancy T. Graham. Their evidence, in substance, is as follows :

*Jamar* testifies, that he was Samuel Hatton's overseer in 1835, and during that time he was present at a conversation which took place between said Samuel and his wife, in reference to a certain tract of land (the Bumpass tract, he thinks); that Mrs. Hatton remarked, that she would not convey her right to the land until they sent home a negro named Emma, who was then in the possession of said Samuel's mother. " He has no distinct recollection of whom the title was to be made, but believes it was to be made to said Samuel's mother, from the fact that said negro Emma was in her possession." In answer to one of the cross-interrogatories, he says, " It was the understanding in the Hatton family, that said Bumpass tract was intended for James Hatton; heard his mother, who was a sister of said James, say so."

*Wm. Acklen* testifies, that he had a conversation with James Hatton, some time in the year 1835, a short time before the date of his mother's will, relative to a tract or tracts of land lying in Madison county, in which conversation said

James stated, " that the legal title to said lands was in him, but that it was purchased with his mother's money; and assigned as a reason for that, that the wife of Samuel Hatton, from whom the conveyance was made, would not consent to unite in a conveyance with her husband to his mother, on account of some family ill-feeling, but was willing to convey to James Hatton, and did so." What particular portion of land it was witness cannot now remember; but his impression is, that it was all the land said James had at that time purchased from Samuel Hatton. Witness wrote the old lady's will, in July or August, 1835, and had been spoken to on the subject three or four times by Samuel Hatton and James Landman; and in this way he received the information above stated. When witness had prepared the old lady's will, according to instructions received from James Hatton and James Landman, he took it out to Landman's house in the country, where he found the old lady and James Hatton; read it over to her, in the presence (as he thinks) of James Hatton and James Landman. "The subject of the land was then mentioned, as it had been left out of the will, and it was then agreed by her, James Hatton and James Landman, that it might stand in that way, as James Hatton would do what was right between his sisters, Nancy Hatton and Mrs. Landman, after she was gone, in relation to the land."

*Robertson Brewer* testifies, that he witnessed the execution of the deed from Samuel Hatton and wife to James Hatton; that the real consideration, though in the deed stated at $2,000, was $1,000, and that the other sum was stated because Samuel's wife was unwilling to sell the land for less; "that said James said, that he was purchasing the land for himself, and intended to keep it; that he did not say whose money he used in paying for said land." Further, that James Hatton lived with his mother in 1834, and for several years previous, and continued to live with her until her death; that his employment was overseeing or superintending her business, and witness does not know of any other means said James had of making money; that there was much property on the plantation on which they lived, which was always called the old lady's. On cross-examination, this witness also testifies, that James Hatton lived with the old lady, his mother, from the

time he first knew them (1829 or 1830) until her death, and managed her business during all that time; that he was very industrious and economical, and his expenses were not more than $150 per annum; that his services on the plantation were worth about $200 per annum; that his boy, who was worked on the plantation, was an average hand, worth about $65 per annum. He also testifies to the execution of another deed in his presence on the same day the deed from Samuel to James was executed, by which Samuel and his wife conveyed another quarter-section of land to the old lady; and he says that Samuel's wife made no objection to joining in the conveyance; that he does not know of James Hatton buying any other property for himself.

*Mrs. Graham* testifies, that the land was first purchased by Samuel for his mother, and with her money, as witness understood from them; never heard James speak of the purchase, nor heard him say that his mother furnished the money; afterwards heard him say that he could not get the deed made to his mother, from the fact that Samuel's wife would not relinquish her dower, in consequence of which, he gave Samuel his note for $1,000, and Samuel gave him his for the same amount, and the deed was made from Sam to James. Witness was at Mrs. Hatton's when James came home with the deed, and then heard him say that the above was true, and that he had to give a false note before he could get Sam's wife to relinquish her dower. The old lady was very deaf; and when James came home, his sisters asked him what he had done; and he thereupon stated what is above repeated. The sisters told the old lady, and James then told her, "not to fret, it should all be done right"; James told his mother, that he would make the title to her; and the old lady said, she knew James would do what was right. Her (witness') understanding was, that there was no real consideration from James to Samuel, but that the lands were passed to blind Samuel's wife, so as to effect a relinquishment of dower.

On cross-examination, she testifies, that James and his two sisters (Julia and Nancy) lived with their mother from 1827–8 to 1836, when she left the neighborhood; that James was industrious and economical, and had a negro boy (Joe)

who worked with his mother's hands; that Julia and Nancy were grown—over full age; "before the making of the deed, heard some of the family (can't say which) say that the land should not remain as it was, in the hands of Samuel, but that James should have it for his services, at their mother's death; and afterwards heard them say he should not have it —that he had used the money produced by the sale of the crops, and had not accounted for it, and Nancy said that James was as big a rascal as Samuel; heard Julia repeatedly say, that she would rather give up the land than have such a fuss about it." She states, also, that on a certain specified occasion, she had said that it never was her understanding that James had been requested or authorized by his mother to purchase said land for her, and that she had never understood, either from said James or his mother, that he had purchased said land for any one; and she now repeats, that what she then said is true; that James owned the negro boy Joe, and got him from his father; that James managed his mother's business from 1827 or 1828, and was a money-making man.

The defendant's testimony was as follows:

*Sally Bransford.*—Heard James and Nancy, after the old lady's death, say that the lower plantation belonged to James, and the mountain land to Julia and Nancy. Heard James Hatton and James Landman say that the old lady always told James to pay himself for his services.

*Richard Jamar.*—Married one of James Hatton's sisters. After the old lady's death, sold his wife's interest in the quarter-section of land conveyed by Sam Hatton to his mother for life, and at her death to her children, to James Hatton.

*Jacob Bransford*, (husband of Sally Bransford.)—James Landman, in 1851, had a conversation with witness, relative to taking his wife's deposition, in which he said, "that he would give (or would not begrudge) $50, if she would tell all she knew about the Bumpass land"; but witness did not understand it as an offer to bribe them, nor does he think that it was so intended.

*M. A. Lewis.*—Was one of the subscribing witnesses to the deed from Samuel and wife to James, and to the other deed, of same date, from the former to the old lady. The consid-

Hatton v. Landman et al.

eration of the former deed was $2,000; some money was paid, and two notes given for the residue. Did not hear Mrs. Hatton make any objection to signing the latter deed. James Hatton resided with his mother, and attended to her business, from 1829 until her death. He was an economical and industrious man, and a good manager. His services, and his slave (Joe), were worth $425 a year. He was engaged in no other business than attending to the old lady's.

*Sally Jamar*, (sister of James Hatton).—Before Landman and Julia were married, witness was at her mother's house one day, when the land was spoken of; Sam told the old lady that they wished to buy the land for James,—that James wanted it for himself; that the old lady replied, she was willing for it to be bought for him, provided it could be paid for without getting her in debt, or selling her negroes; she complained that she could not ascertain from James what her cotton crop sold for,—that her money paid for the land. Did not hear anything said about his services. Heard the old lady tell James that her money paid for the land; he claimed the land, but admitted that it was paid for with her money.

*James W. Allen.*—Wrote the deed, by which James Hatton of the one part, and Landman and wife and Lynch and wife of the other part, in consummation of a contract, exchanged their interests in certain lands descended to them from their mother. " When about to write the deed, I called for the description, &c., and having received it for the one quarter-section only, I asked what became of the balance of the old tract; and James Hatton replied, in the presence of some (can't certainly say all) of the parties, " The other part of the land is mine, I have the title to it, and paid for it myself," or " I paid for it with my own money,"—*that* does not belong to the estate." Witness accordingly wrote the deed for the one quarter-section, and heard nothing more said on the subject, then or afterwards.

*F. P. Ward.*—Acted as Mrs. Hatton's agent in the sale of the land to Toney. Advertised it for sale in the Huntsville Democrat. Told Landman what Toney had offered for it; the latter then set up no claim to the land, and said that the widow ought to sell. Had a subsequent conversation with him, and told him that he (witness) had heard Allen say, that

at the division of the old lady's property James Hatton claimed the land as his own, in the presence of complainants, and that no objection was made; Landman replied that it was true. Witness inquired why he had not set up a claim to the land in the lifetime of James Hatton; his reply was, "that he did not know that the land was purchased for James Hatton's mother, and with her money; he said, James Hatton always claimed the land, and concealed the fact that it was bought for his mother."

There were three subscribing witnesses, R. Brewer, M. A. Lewis, and Alexander Ross, to the deed of Samuel Hatton and wife to James Hatton, for the south-east quarter of section four, township five, and range two west; but the two first named only were examined as witnesses.

On final hearing, on bill, answer, and proof, the chancellor rendered a decree for the complainants, except as to the eighty-acre tract; and his decree is now assigned for error.

BRICKELL & CABANISS, for the appellant, made these points:

1. Mrs. Hatton being charged by the bill with knowledge of the facts out of which the claim to relief grows, her answer is evidence for her, until contradicted by two witnesses, or by one witness with corroborating circumstances.—Fenno v. Sayre & Converse, 3 Ala. 478; Branch Bank at Huntsville v. Marshall, 4 ib. 64; May v. Barnard, 20 ib. 209.

2. There is not that conformity between the allegations and proof, which is required by the strict rule to which this court has uniformly adhered.—Paulling v. Lee, 20 Ala. 768; Evans v. Battle, 19 ib. 401; McKinley v. Irvine, 13 ib. 693; Duren v. Parsons, 3 Port. 363; also, Forsyth v. Clark, 3 Wend. 655.

3. The evidence in the case, consisting chiefly of loose declarations or acknowledgments, is not sufficient to establish a resulting trust; especially after so great lapse of time, when no excuse for the delay is shown.—White & Tudor's Leading Cases in Equity, vol. 1, p. 200; Lench v. Lench, 10 Vesey, 517; Baker v. Vining, 30 Maine, 126; Bryan & McPhail v. Cowart, 21 Ala. 91; Jemison v. Graves, 7 Blackf. 447.

ROBINSON & JONES, and C. C. & J. W. CLAY, *contra*, contended,—

1. That, since the bill does not charge the defendant with personal knowledge of the transaction out of which the trust arises, and the denials of the answer are made upon information and belief, one witness is sufficient to establish the trust.

2. That, though there is some immaterial discrepancy in the testimony, the fact that the land was purchased and paid for with the money of Mrs. Frances Hatton is clearly proved; and this fact being established, a trust results to her, which, since her death, enures to the benefit of the complainants, as her devisees.—2 Story's Equity, § 1201; 2 Sugden on Vendors & Purchasers, m. p. 135; Willis v. Willis, 2 Atk. 71.

RICE, J.—The resulting trust alleged in the bill is a mere creature of equity, founded upon presumptive intention, and designed to carry that intention into effect,—not to defeat it. It will not attach in the person who supplies the purchase money, if it was not the intention of either party that the estate should vest in him or her. It will not be raised in opposition to the declaration of the person who advances the money, nor in opposition to the obvious purpose and design of the transaction. The presumption of such a trust does not arise, from the mere fact that the purchase money is supplied by *a parent*, and the conveyance taken in the name of *the son*, who is not shown to be provided for.—1 White & Tudor's Lead. Cases in Equity, 204.

It is conceded, on all hands, that no such trust is proved as to the eighty-acre tract described in the bill; but it is contended that such trust is proved as to the quarter-section conveyed by Samuel Hatton to James Hatton on the 11th February, 1834. And that is the only matter which we are called upon to examine and decide.

There is evidence that the price really paid for the quarter-section was one thousand dollars; that James was an economical and money-making man, and a good manager; that his mother (a widow) had the benefit of his undivided attention to her business, from 1827 or 1828, until her death in 1841; that during that period he attended to no other business; that she also had the services of his only slave on her plantation, until the last of the year 1839; that these services of James and his slave, up to February, 1834, (when the conveyance of the

land was made to James,) were worth a much larger sum than the price paid for the land. There is no proof that James ever received any compensation for these services, unless the money paid for the land, or the land itself, was regarded and treated as such compensation.

Mrs. Jamar (a sister of Samuel and James Hatton, and of the female complainants) testifies that, before the land was conveyed to James, she was at her mother's, when the land was spoken of; that Samuel then told her mother they wished to buy the land *for James*, that *James wanted it for himself;* that her mother replied, she was willing for it to be bought *for James*, provided it could be paid for without getting her in debt or selling her negroes. There is no proof, or pretence, that the purchase of the land did get her in debt, or cause the sale of any of her negroes.

There are three subscribing witnesses to the conveyance of the land to James. One of them is not examined, and no reason is shown for this omission. The testimony of the other two does not even tend to prove any thing like a resulting trust for the mother of James, but, on the contrary, tends to prove that the purchase was made for him.

There is evidence that, when the mother of James told him that her money paid for the land, he admitted that fact, but *claimed the land as his own;* that she knew he claimed the land as his own; that, soon after her death, he took actual possession of it, and claimed and used it as his own, until his death in March, 1847, and devised it to his widow, who continued in possession until she sold and conveyed it to Toney, a *bona fide* purchaser without notice of any opposing claim to it; that some (if not all) of the complainants knew that James claimed the land as his own before his mother's death, and continued to claim and use it as his own after her death; that complainants were of lawful age as far back as 1834; and that Nancy Hatton did not marry John M. Lynch until after the death of her mother, Frances Hatton.

The bill was not filed until October, 1850, more than sixteen years after the conveyance to James, more than nine years after the death of his mother, about three years and a half after his death, and nearly a year after the sale by his widow to Toney. No excuse for this long and remarkable

delay in asserting their claim is proved by the complainants. They allege ignorance of the facts on their part, and concealment of the facts on the part of James Hatton; but this allegation is disproved.

Mr. Acklen testifies, that James Hatton, "some time in the year 1835, a short time before the date of his mother's will," had a conversation with him " relative to *a tract* OR TRACTS of land lying in Madison county;" and that James then stated " that the legal title to *said lands* was in him, but that *it* was purchased with his mother's money." If it is conceded that James Hatton made this statement in relation to the quarter-section described in the bill, it is insufficient to support the claim of complainants, as asserted in their bill, when taken in connection with the fact that James was *the son* of Frances Hatton. For, when the title to land is taken to *a son*, and the purchase money is supplied by *the parent*, the purchase is deemed *prima facie* as intended as an advancement, so as to rebut the presumption of a resulting trust for the parent. 2 Story's Eq. Jur. §§ 1201, 1202.

But the date of the will of Frances Hatton is July, 1838, which proves that Mr. Acklen makes a mistake of about three years as to the date of the will, although it was written by himself! We have no doubt of his honesty, but we have as little doubt that he is mistaken as to this date. And we believe he is also mistaken, when he says that James Hatton "assigned as a reason for that, that the wife of Samuel Hatton, from whom the conveyance was made, *would not consent to unite in a* conveyance with her husband *to his mother*, *on account of some family ill-feeling*, but was willing to convey to James Hatton, and did so." For it is incontestably proved that, on the very day the conveyance of the quarter-section was made to James Hatton, the wife of Samuel did unite with her husband in a conveyance of another tract *to his mother !* Besides this, the subscribing witnesses who are examined clearly prove that " family ill-feeling" was *not* the reason why the conveyance was made to James Hatton.

Mr. Acklen testifies, also, that after he wrote the will, it was read over to Frances Hatton, in the presence (as he thinks) of James Hatton and James Landman; that " the subject of the land was then mentioned, as it had been left out

of the will, and it was then *agreed* by her, James Hatton, and James Landman, that it might stand in that way, as James Hatton would do what was right between his sisters, Nancy Hatton and Mrs. Landman, after she was gone, in relation to the land." The bill does not set forth *this agreement*, nor claim any right under it. But, if it did, it is clear that it could not be enforced as an agreement, because it is void for uncertainty. It furnishes no means by which the court could determine " what was right between his sisters" and James, in relation to the land.—Erwin v. Erwin, 25 Ala. Rep. 236.

But it is urged, that, although the agreement is void for uncertainty as an agreement, yet it is an admission that the land really did not belong to James, but to his mother. We cannot assent to that; for we cannot believe that an agreement by A., to do " what was right" between himself and his sisters, in relation to land which was held by him under a conveyance from its former undisputed owner, is, *per se*, an admission that the land did not belong to him but to another person.—Flagg v. Mann, 14 Pick. Rep. 481.

Besides all this, it appears that the mother of James lived more than three years after her will was written and this agreement made. Why did not she, or Mr. Landman, the husband of Mrs. Landman, during those three years, obtain from James Hatton some satisfactory evidence that he did not hold the land for himself alone, but for himself and his two sisters? If to this question it is answered, that James Hatton, by his said agreement, *fraudulently prevented* them from obtaining such evidence, or an alteration of the will of his mother, then we reply, it is very strange that this *fraudulent prevention* of acts to the prejudice of his sisters, which is a distinct and clear ground of equitable relief, is not even alleged in the bill, although James Landman, one of the parties to the alleged agreement, is one of the complainants in the bill.

A part of Mrs. Graham's testimony is very favorable to complainants, but another part is equally unfavorable to them. For " her understanding was, that there was *no real consideration* from James to Samuel, but that the lands were passed to blind Samuel's wife, so as to effect a relinquishment of dower." If this be so, it defeats the claim of the complain-

ants, which is by their bill grounded on the facts, that James did *buy* the land of Samuel, and did *pay him one thousand dollars* for it; and " that the thousand dollars, so by said James to said Samuel paid for said land, was in fact the money of said Frances." If *nothing was paid* in consideration of the conveyance of the land to James, there could not have resulted to his mother, at the time of that conveyance, any such trust as is alleged in the bill.

Mrs. Graham further testifies, that, immediately after James obtained the conveyance, he went home and informed his mother and sisters that it was made out *to him*, and gave a statement of the circumstances; which statement Mrs. Graham undertakes honestly to detail. She also testifies, that James then told the old lady, who was very deaf, "not to fret, it should all be right," and offered to make the title to her; and that the old lady said she knew James would do what was right. Although she knew that he afterwards claimed that the land was *his own*, and that he bought it *for himself*, and although she lived more than seven years after James had offered to make her the title, she never did take the title, but left it to James, with the unlimited and undefined discretion of absolute ownership in him. She practically disclaimed and renounced any and all right of disposition, control, or ownership over it, and actually refused to take from him the power of doing with the land what he thought was right, although she knew that he was willing to surrender the title to gratify her.

We are asked, now, to do what the mother of James, by his voluntary offer, had the opportunity to do for seven years before her death, but never would do! We are asked to do this, by those who claim it only as a bounty from that mother, and in her name! We are asked to do it, by those who, being of full age, and having knowledge of the material facts, in the life time of James and his mother, never made the request until nine years after the death of that mother, and more than three years after the death of that son. The laws of our country require us to pronounce the evidence insufficient to sustain such a claim. In such cases, courts of equity consider the acts of the parties as evidence of the intent, and require the complainants to sustain their claim by evidence

which is full, clear, and satisfactory.—1 White & Tudor's Lead. Ca. in Equity, 201; Gaither v. Gaither, 3 Md. Ch. Decisions, 158; Farringer v. Ramsey, 4 *ib.* 33; Bryan v. Cowart, 21 Ala. R. 92. See, also, Gascoigne v. Thiving, 1 Vernon, 366; Baldwin v. Campfield, 4 Halsted's Ch. Rep. 891.

All the evidence may be reconciled, upon the following hypothesis : That Francis Hatton was not exempt from the infirmities incident to persons far advanced in years; that she obtained from her son James that protection and care of her person and property which is so necessary and grateful to an aged widow; that she entertained for him a partiality which was natural and deserved; that she was not willing that her daughters should know of this partiality; that, from the time of this conveyance to James until her death, she really intended that he should have the land for himself, and should do with it what he thought was right; that by her assent he really bought the land for himself; and that, with an affection worthy of all commendation, he held his time, his talents, and his property, subject to any disposition which would secure to her the greatest amount of tranquillity and gratification.

Upon this hypothesis, his declarations and her declarations can be reconciled with the non-existence of the alleged resulting trust, or with its waiver and discharge by her before her death, if it ever did exist.

It is due to all the witnesses to say, that we concede to them purity of intention, but not infallibility, especially in the narration of declarations made many years ago, and in which they had no possible interest.

A decree must be entered here, reversing the decree of the chancellor, and dismissing the bill; and the complainants must pay the costs of this court, and of the court below.