[Lehman et al. v. Lewis.]

# Lehman *et al. v.* Lewis.

*Bill in Equity to declare and enforce Resulting Trust.*

1. *Resulting trust; when arises.*—Where a purchase of lands is made through an agent, who takes title to himself, a trust will result to the principal ; or if a trustee employs the funds of a *cestui que trust,* or an agent, the money of the principal in the purchase of lands, the *cestui que trust,* or principal, may elect to hold the agent or trustee personally liable, or to follow the money into the land, or a trust of the legal estate will be declared by implication of law.

2. *Same.*—To constitute a simple resulting trust, where one person's money is used in paying for lands conveyed to another, the money must be paid at the time of the purchase ; but when a trustee thus uses trust funds, it is not essential to the *cestui que trust's* equity to charge the lands, that the money be paid at the time of the purchase. The right may be enforced, whether the payment be made before or after the purchase, so long as the trust funds can be traced into specific property, and against all persons except *bona fide* purchasers.

3. *Statute of frauds; what trusts not within.*—Such trusts, not arising from or being dependent upon any agreement between the parties, but implied by law from the facts proved, are specially exempted from the operation of the statute of frauds.

4. *Resulting trust; what will not create.*—Oral agreements, without the ownership of the money, though cotemporaneous with the purchase, will not create the trust ; these, though broken, if there be not fraud or imposition, are within the statute of frauds.

5. *Same; what will create.*—If one, by way of loan, and wholly upon the credit and account of another, advance the purchase-money, taking title to himself as security for its repayment, he holds the estate upon a resulting trust for the other, and on repayment will be compelled to reconvey.

6. *Resulting trust; what averments and proof necessary to establish.*—Where a resulting trust is sought to be established and engrafted upon a conveyance absolute in its terms, the complainant must, by his bill, distinctly and precisely aver the facts from which it is claimed to result, and the proof must correspond with the pleading, and must be clear, full, satisfactory and convincing—the burden of removing the presumption arising from the terms of the conveyance, being on the party asserting the trust.

APPEAL from Bullock Chancery Court.
Heard before Hon. B. B. McCRAW.
The opinion states the case.

STONE & CLOPTON and H. C. TOMPKINS, for appellants.—It is enacted that no trust concerning lands, except such as results by implication or construction of law, or which may be transferred or extinguished by operation of law, can be created, unless by instrument in writing.—Rev. Code, § 1590. By this statute, all trusts are prohibited which do not result from operation of law ; from certain facts being shown to exist, and independent of any agreement. A resulting trust

is not founded on any contract, and a verbal agreement to purchase lands for the benefit of another is void under the statute of frauds.—13 Ill. 186; 16 Dana, 331; 4 Md. 465; 9 Watts, 32.

Locke did not occupy any fiduciary relation to the appellee, nor did he have any of her money in his hands at the time of the purchase or the conveyance. To raise an implied trust, an actual payment, or actual loan of money by the *cestui que trust* at the time of the purchase, must be shown. It is a presumption of law, and must arise, if at all, at the time of the conveyance, and the money, which is the foundation of the trust, must be then paid or secured to be paid. 2 John. Ch. 404; 5 John. Ch. 1; 2 Paige, 217–238; 16 Verm. 500; 1 Hoffman Ch. 90; 3 Ala. 302. The evidence in this case fails to show any purchase by Locke which would create a resulting trust in favor of appellee.

J. N. ARRINGTON, *contra.*—The trust set up by the appellee is not within the statute.—R. C. § 1590. It is a resulting trust, and such trusts are expressly excepted from its operation.—42 Ala. 60; Perry on Trusts, 2d Ed. §§ 137–226. The money first advanced by Locke was a loan to appellee, and it is the same as if she had advanced to him so much cash. 44 Ala. 236. The cases cited by Mr. Perry in his work on Trusts, § 133, fully establish this proposition. The trust in this case arose, not from the agreement by Locke to purchase for appellee, but from his purchase with money which was hers at the time he took the title to himself. It resulted from his acts and not from his agreement, and does not fall within the operation of the statute of frauds.—25 Iowa; Perry on Trusts, 2d Ed. § 134, and note. The appellee was in the undisturbed possession of the land at the time of the appellants' purchase from Locke, and there can be no question of *bona fide* purchaser. The cases of *Barrell v. Hanrick*, 42 Ala. 60, and *Robinson v. Robinson*, 44 Ala. 235, are conclusive of this case in favor of the appellee.

BRICKELL, C. J.—The bill was filed by the appellee, a married woman, and alleges, in substance, that in the latter part of 1869 her husband purchased for her, of one King, a tract of land, at the price of three thousand dollars. At the time of the purchase, one Henry Clark had in his hands about three thousand dollars, the statutory estate of the appellee, and her brother, M. B. Locke, was the agent for its collection. To enable her husband to make the purchase of the lands, said Locke advanced to him, as a loan to her, the purchase-money of said lands, on the agreement that he was

to be repaid from the moneys in Clark's hands when collected; and the moneys were by him collected subsequently, and that she assented to the appropriation of the same to his reimbursement of the money loaned. The conveyance of the title to the lands was made to Locke, but of this fact the appellee avers her ignorance until after the death of Locke. On the 22d April, 1870, Locke, by absolute deed, intended as a mortgage to secure pre-existing debts, conveyed the lands to the appellants, who had commenced against the husband of appellee an action of ejectment for the recovery of possession thereof. The prayer of the bill is, that the action of ejectment be perpetually enjoined, and the appellants required to convey the lands to appellee, and for general relief.

The answer of the appellants is a general denial of all the material averments of the bill, or a general disclaimer of all knowledge or information of them, demanding full proof.

Two questions arise: 1. Whether the transaction, as averred in the bill, resting wholly in parol, creates an equity in favor of the appellee, which can be enforced. 2. Whether the evidence is sufficient to establish the equity. The statute declares, "no trust concerning lands, except such as results by implication or construction of law, or which may be transferred or extinguished by operation of law, can be created unless by an instrument in writing, signed by the party creating or declaring it, or his agent, authorized in writing."—Code of 1876, § 2199. This is a substantial re-enactment of the seventh and eighth sections of the English statute of frauds, and by its terms, the creation, and consequently the proof by parol of all direct or express trusts, springing from and dependent upon the agreement of parties, not arising or resulting by implication or construction of law, is prohibited. There not being any declaration in writing of the trust now asserted, no memorandum of the agreement it is averred Locke entered into, the first question must be limited to the inquiry, whether, from the facts stated, a trust of the legal estate taken to himself by Locke, results by construction of law to the appellee.

It is the unquestionable doctrine of courts of equity, in the absence of statutes providing otherwise, that if the purchaser of lands, paying the price with his own money, takes the conveyance in the name of another, the trust of the lands results by construction to him from whom the purchase-money moves. Or, if the purchase is made through an agent, who takes title to himself, the trust will result to the principal, who advances the purchase-money. Or, if a trustee employs the funds of the *cestui que trust*, or an agent, the

moneys of the principal, in the purchase of lands, at the election of the *cestui que trust*, or of the principal, the trustee, or the agent, may be made personally liable, or the money followed into the land, or a trust of the legal estate will result by implication of law. This class of trusts, not arising from or dependent upon any agreement between the parties, implied by the law from facts proved, are specially excepted from the operation of the statute of frauds, and it is said the exception, if not expressed, would have been a necessary implication.—*Hoxie v. Carr*, 1 Sumn. 187.

The whole foundation of this class of trusts is the payment *before, or at the time of the purchase*, of the money by the *cestui que trust*, or by the trustee, or the agent, of funds which are the funds of the *cestui que trust*, or of the principal. Mere parol agreements, or parol declarations of the purchaser that he is buying for another, or that the purchase is intended for the benefit of another, without the employment of the money of the other, will not create a resulting trust. In *Botsford v. Burr*, 2 Johns. Ch. 405, said Ch. Kent : " The trust must have been coeval with the deeds, or it cannot exist at all. After a party has made a purchase with his own moneys or credit, a subsequent tender, or even reimbursement, may be evidence of some other contract, or the ground of some other relief; but it cannot, by any retrospective effect, produce the trust of which we are speaking. There never was an instance of such trust so created, and there never ought to be, for it would destroy all the certainty and security of conveyances of real estate. The resulting trust, not within the statute of frauds, and which may be shown without writing, is when the purchase is made with the proper moneys of the *cestui que trust*, and the deed not taken in his name. The trust results from the *original transaction* at the time it takes place, and at no other time ; and it is founded on the *actual payment of money*, and on no other ground. It cannot be mingled or confounded with any subsequent dealings whatever. They are to be governed by different principles, and the doctrine of a resulting trust would be mischievous and dangerous, if we once departed from the simplicity of the rule. It is a very questionable doctrine in the view of policy, even under this limitation, and it has been admitted with great caution." Following this authority, we said in *Tillford v. Torry*, 53 Ala. 122, in which a *cestui que trust* asserted an equity to follow trust funds into lands, or a resulting trust therein : " To create the equity either to charge the lands or to raise a resulting trust, a payment of the trust funds at the time of the purchase is indispensable. A subsequent payment by the trus-

tee of the debt he may have contracted in the purchase of
the lands, will not, by relation, attach any trust or lien to
the original purchase."

The trust resulting at the time of the purchase, if at all,
and arising from the fact that the moneys, the consideration
of the purchase, is the money of the *cestui que trust*, and not
of the grantee, in whom the legal estate resides, oral agree-
ments, without the ownership of the money, though cotem-
poraneous with the purchase, will not create it.—Perry on
Trusts, §§ 133–35. These, though broken, if there be not
fraud or imposition, are within the operation of the statute
of frauds.— *Kisler v. Kisler*, 2 Watts, 323; *McDonald v. May*,
1 Rich. Eq. 91; *Johnston v. Lamotte*, 6 ib. 347; *Taliaferro v.
Taliaferro*, 6 Ala. 406. "Where a man employs another per-
son by parol, as an agent, to buy an estate for him, and the
latter buys it accordingly in his own name, and no part of
the purchase-money is paid by the principal, then, if the
agent denies the trust, and there is no written agreement or
document establishing it, he cannot, by a suit in equity, com-
pel the agent to convey the estate to him; for (as has been
truly said) that would be decidedly in the teeth of the stat-
ute of frauds."—2 Story's Eq. § 1201. But if one should, by
way of loan, and wholly upon the credit and account of an-
other, advance the purchase-money, and take title to himself
as security for its repayment, he would hold the estate upon
a resulting trust for the other, and on repayment, would be
compelled to convey.—Perry on Trusts, § 133; *Rathwell v.
Dewett*, 2 Black (U. S.) 613; *Boyd v. McLean*, 1 Johns. Ch.
484; *Page v. Page*, 8 N. H. 187; *Runnells v. Jackson*, 1 How.
(Miss.) 358; *Loundsbury v. Pursdy*, 16 Barb. 380; *Buck v.
Pike*, 11 Me. 9. It is within this principle it is insisted the
present case falls.

The general rule is, that when a resulting trust is sought
to be established and engrafted upon a conveyance, absolute
in its terms, the complainant must, by his bill, distinctly and
precisely aver the facts from which it is claimed to result.
The proof must correspond with the pleading, and must be
clear, full, satisfactory and convincing. If the proof is un-
certain; if it is doubtful and unsatisfactory, relief cannot be
granted. The presumption arising from the conveyance,
that it fully speaks the whole truth, must prevail until the
contrary is established beyond reasonable controversy. The
burden of removing this presumption rests upon the party
asserting the contrary, and it is not enough for him to gen-
erate doubt and uncertainty. "A judgment of the court, a
deliberate deed or writing, are of too much solemnity to be
brushed away by loose and inconclusive evidence."—*How-*

*land v. Blake,* 97 U. S. 626 ; Perry on Trusts, § 137 ; 1 Story's Eq. § 152 ; 1 Lead. Eq. Cases, 273 ; *Tilford v. Torry,* 53 Ala. 120.

The verbal declarations or admissions of the grantee, in whom the legal estate resides, are admissible as evidence against him, and all claiming under him otherwise than as *bona fide* purchasers for value.—1 Lead. Eq. Cases, 273. Evidence of this kind is admitted to be most unsatisfactory, and is received with great caution.   It is so easy of fabrication, so incapable of contradiction, and the total alteration of its effect which the slightest mistake, or failure of recollection may cause, that after the death of the grantee it will not be made the basis of a decree establishing a resulting trust, or an equity, in opposition to the terms of a conveyance, unless it is clear, consistent and corroborated by circumstances.—*Lench v. Lench,* 10 Vesey, 518 ; *Smith v. Burnham,* 3 Sum. 438 ; *Botsford v. Burr,* 2 Johns. Ch. 405 ; *Luelling v. Atterback,* 1 Bibb, 609 ; *Hatton v. Landman,* 28 Ala. 127 ; *Baker v. Vining,* 30 Me. 121 ; 2 Whart. Ev. § 1037.

The first inquiry of fact is, whether there was a loan to the appellee by Locke of the money with which to purchase the lands, and which were employed in the purchase.   The evidence tending to prove it, comes from the appellee, from her husband, her brother, Jesse Locke, and from King, the vendor and grantor.   The evidence of the appellee is, that Locke agreed to advance the first payment on the lands, and was to be reimbursed from the moneys he expected to receive from Clark.   That he received from Clark, through Watts & Troy, $1,500 in December, 1869, and $1,500 in or about January, 1871, and that he told her it had been used in the purchase of the lands.   The bill avers her ignorance of the fact that title was made to Locke until after his death, and yet she testifies that it was so made at the request and instance of her husband, without her knowledge, but that she was informed of it in December, 1869, soon after taking possession of the lands ; and on complaining to Locke, he promised *to have it changed and made in her name,* and appointed a time at which it should be done.   The deed to Locke was executed on 6th December, 1869.   The evidence of the husband is, that Locke advanced the money to buy the lands, intending to reimburse himself from the money expected to be collected of Clark.   Two thousand dollars of the purchase-money was paid in December, 1869, and one thousand in January, 1870.   The money, he states, was the funds of the appellee, advanced by Locke, and Locke told him subsequently he had been repaid out of the Clark money. *Jesse Locke* states the lands were purchased for the appellee,

the purchase-money advanced by M. B. Locke, and that subsequently he was told by M. B. L. that he had been repaid by the moneys received from Clark, except about five hundred dollars; that originally there was due the appellee three thousand dollars from Clark, but the attorneys' fee had reduced it to twenty-four or twenty-five hundred dollars. Neither he or the husband give any reason for the making of the deed to Locke, or state their knowledge or ignorance that it was so made. *Joseph King*, the vendor and grantor of the lands, states that he sold the lands to Locke for the appellee, and the purchase-money was paid him by Locke, who stated that it was the money of the appellee, and that he had left of her money, after paying it, four or five hundred dollars; that Locke took the deed to himself, as he said, to prevent the husband of the appellee from selling the lands and using the proceeds, or being liable to his debts, and that at some future time he would make a deed to the appellee. The deed was delivered to Jesse Locke and W. J. Lewis, the husband of appellee.

The evidence of King does not correspond with the averments of the bill, and is inconsistent with that of the appellee, her husband, and Jessie Locke. It proves that Locke, so far from loaning the purchase money to the appellee, had moneys of hers, in his hands, the amount of which was not exhausted by the purchase, and that from these moneys he paid the price of the lands. The reason which he says Locke assigned for taking title to himself, instead of to the appellee, though avowing his purpose to make her title at some future time, it is matter difficult to believe he could have asserted. Locke could scarcely have been ignorant that if the lands were purchased with moneys of the statutory estate of the appellee, they could not be made liable to the debts of the husband, nor could the husband sell them and use the proceeds of sale. Nor is this testimony consistent with that of the appellee, that Locke promised her that he would have the deed changed and made to her, placing the lands in the peril, from which he proposed to preserve them by taking the title to himself.

There is also an unexplained inconsistency between the evidence of the appellee and her husband, and that of Jessie Locke. The latter states that his brother told him he had been reimbursed the moneys he had advanced in the purchase of the lands, except about five hundred dollars, the fees of the attorneys for collecting the debt from Clark. The former states that he said he had been fully reimbursed. Chase, the book-keeper of Locke, states the purchase money of the lands was loaned to the husband of the appellee, and

was charged to him on the books of Locke—$2,000 on 6th December, 1869, and $1,000 paid his note to King, January 17th, 1870, and that at the time Locke told him it was to buy the King place, as the lands seem to have been known. The money received from Watts & Troy, who collected the Clark debt, which was the debt from which the appellee, her husband and Jessie Locke say M. B. L. was reimbursed the money he had advanced in the purchase of the lands, was credited to the estate of H. T. Clark, on the books of said Locke, making him a debtor to the estate. The amount received was $2,586 75, less $113 25, expenses of collection. $1,200 75 was received January 7th, 1870, and $1,385 50 December 16th, 1870. The books of Locke show that at his death, the husband of appellee was indebted to Locke, in the sum of $6,302 29, of which $3,000 was the purchase money of the lands. They also show Locke indebted to the estate of H. T. Clark in the sum of $2,473, the net proceeds of the debt collected by Watts & Troy. These entries are cotemporaneous with the transactions to which they refer, and their truth in some respects is corroborated by the undisputed facts. The first payment of the purchase money of the lands, was two thousand dollars, made on the execution of the deed, which is shown to have been December, 6th, 1869, when the husband is charged therewith. For the remainder of the purchase money, the husband gave his individual note to King, and this was paid 17th January, 1870, and charged to him.

The appellee, by reason of her coverture, was incapable of contracting a debt for money loaned, or in the purchase of lands. No promise she made, or could have made, was binding on her personally, or on her statutory estate, if any she had. If there was any loan of money made to her by Locke, and any promise by him that on its payment he would convey the lands to her, or that he would hold the lands as security for its repayment ; or, that he would pay the purchase money, and reimburse himself from moneys he expected to receive of her statutory estate, the promise was not binding. There was no mutuality in the contract she was incapable of entering into it, and being incapable, Locke could not be bound by it. If from moneys of her statutory estate, Locke was reimbursed the money he had advanced, the want of mutuality in the original contract, it may be, Locke could not set up as a bar to its performance. The payment of the money to him, if it was recognized by a court of equity, would place him in the same situation he would occupy, if the appellee was *sui juris*. Is it more probable that a transaction of that character was entered into, or that

[Lehman et al. v. Lewis.]

which the cotemporaneous entries on Locke's books imports—a loan of money to the husband to purchase the lands, Locke taking title to himself to secure its payment?

The material fact that, which in any aspect of the case, the appellee was bound to prove, was that Locke had been repaid the purchase money of the lands in whole or in part. The payment, it is not pretended, was made from any other source, than from the money collected from Clark. If that money was hers, the means of proving it was in her power. If it was improperly credited by Locke to the estate of her first husband, if he received it as her agent, and in no other capacity without incurring any liability otherwise, the proof of the facts must be within her knowledge and possession. The debtor Clark, the attorneys collecting it, could have been examined. She knew the facts and could have stated them fully and explicitly. It is probable also, they were known to her husband and her brother; and yet neither of them states more than the admissions or declarations of Locke; or, generally, that the money was due to the appellee, without stating the facts which can satisfy others they are not mistaken. All cases of this kind are to be judged not only by the evidence which a party may produce, but by considering that which he could have produced. A party having more certain and satisfactory evidence in his power subjects his cause to unfavorable suspicion, if he relies upon that which is of a weaker and inferior nature. The suspicion strengthens, when he relies upon the verbal admissions of the dead, which they have not the opportunity to explain or contradict, when they have the means of producing evidence not subject to infirmative considerations.

The evidence is too uncertain, inconsistent and inconclusive, to afford that conviction which will overcome the terms and effect of a deed in writing. It may be the appellee has some equity in the lands, but she has failed to establish it; and it would be a dangerous precedent, in view of the facts of this case, to divest an estate resting upon the best evidence which the law requires, and which must be presumed true, until overcome by full, clear and convincing proofs.

The decree of the Chancellor must be reversed, and a decree here rendered dismissing the bill at the costs of the next friend of the appellee in the Court of Chancery, to be taxed by the Register, and he must pay the costs of this appeal.

STONE, J., not sitting.