# Winston v. Mitchell.

*Bill in Equity to establish Resulting Trust in Lands.*

1. *Correspondence of pleadings and proof.*—When the bill seeks to establish a resulting trust in lands, a closer correspondence between the pleadings and the proof is required than in other cases, except bills for the reformation or specific performance of contracts, which are strictly analogous.

2. *Resulting trust in lands; variance.*—Where the father procures a transfer to himself of a judgment against his daughter's husband, for which he was also bound as surety on a *supersedeas* bond, and sells the husband's lands under execution issued on it, becoming himself the

purchaser, and taking the title in his own name with the word *agent* added; a resulting trust will be declared in favor of the wife and daughter, on averment and proof that the transfer of the judgment was procured at her instance, under an agreement between her father and herself, and paid for with the proceeds of the sale of certain bank stock belonging to her statutory estate, in order that the lands might be bought and held for her benefit; but, if the evidence shows that the bank stock was in fact not sold for a year after the transfer of the judgment, and that the agreement between the parties did not contemplate a sale and purchase of the lands under execution on the judgment, there is a fatal variance between the allegations and the proof.

3.  *Same.*—If the bill had alleged that the judgment was purchased with money raised by a pledge of complainant's bank stock, and claimed a resulting trust in all of the lands, while the evidence showed that only a part of the money was procured by a pledge of the bank stock, the variance would have been fatal to relief, though the complainant might have had relief under another bill.

4.  *Constructive trust arising from use of wife's funds.*—If the judgment was purchased by the father, by agreement with his married daughter, with money borrowed on a pledge of her bank stock, she having no legal capacity to bind herself or her statutory estate by a contract for the loan of money, the agreement could not be enforced against him, unless he is estopped from setting up the want of mutuality; but a trust arises by implication of law from such illegal use of her statutory funds, which she may follow into the lands purchased with them, unless she elects to hold the parties personally liable for the conversion; and seeking to enforce a trust in the lands, she may claim interest accruing since February 28th, 1887, when the statute now of force became operative.

APPEAL from the Chancery Court of Sumter.

Heard before the Hon. THOS. W. COLEMAN.

The bill in this case was filed on the 1st of February, 1887, by Mrs. Martha A. Mitchell, who was the wife of Daniel Mitchell and the daughter of Augustus A. Winston, against her said father and husband; and sought to establish and enforce a resulting trust in her favor, in certain lands which had belonged to her husband, and which had been sold under execution against him, her father becoming the purchaser, and taking the title in his own name. The lands consisted of three separate tracts, or places: 1st, the "Patton tract," containing about fifteen hundred acres, of which said Mitchell owned an undivided one-half interest; 2d, the "Harrison tract," containing about 390 acres; and, 3d, the "Long place," the area of which is not shown. These lands were sold by the United States marshal on the 6th of June, 1881, under an *alias* execution, issued on a judgment of the Circuit Court of the United States at Mobile, in favor of Catherine Moore against said Daniel Mitchell, for $6,350.44, as affirmed by the U. S. Supreme Court on appeal; Winston being surety for Mitchell on a *supersedeas* bond in the case. Three separate deeds were executed by

[Winston v. Mitchell.]

the marshal to said Winston, the word *agent* being added after his name in each case, at the following prices: 1st, the Patton tract, $3,025; the Harrison tract, $505; and the Long place, $505, all aggregating $4,035; and copies of these deeds were made exhibits to the bill. The allegations of the bill as amended, on which complainant sought to establish a trust in her favor in these lands, were in these words: "Your oratrix was then the owner of $10,000 of bank stock in the Gainesville National Bank, which she owned as her statutory separate estate. . . Prior to April, 1878, one Catherine Moore obtained a judgment in the United States Circuit Court at Mobile, against said Daniel Mitchell, for several thousand dollars, besides costs of suit. . . On or about April 17, 1878, said judgment was transferred to said A. A. Winston, for the sum of $6,811.12, including costs of suit, which sum was derived by him from the proceeds from her said statutory separate estate; and your oratrix alleges that said transfer to said Winston was made to him as her agent, for the purpose of saving the land of her husband, and buying the same in for herself, in case the same was sold under execution on said judgment; which said Winston well knew, agreeing to assist your oratrix in effecting that end, advising her therein, and using her statutory separate estate therefor. . . Afterwards an *alias fi. fa.* was issued on said judgment, and levied on said lands, together with some personal property; and the same was bought in by said A. A. Winston, as her agent, at the price of $4,572.50. The three deeds made to said Winston by the U. S. marshal, copies of which are hereunto annexed as exhibits, show that he bid for it as agent, paid for it as agent, and took the title to himself as agent. Your oratrix alleges that said judgment was her own; that she furnished the money to pay for it; that the land was sold under said *fi. fa.* for the purpose of putting the title in her, and that said Winston bid for, bought, paid for, and got the title thereto as her agent and trustee, and by her said means." The defendant Winston denied the material allegations of the bill, out of which a resulting trust was claimed to arise; alleging that he bought the judgment with his own funds, and that the proceeds of the complainant's bank stock, afterwards transferred, were used with her knowledge and consent in paying other debts of her husband, on which he was bound as surety.

On final hearing, on pleadings and proof, the chancellor rendered a decree for the complainant; and his decree is here assigned as error by defendant Winston.

PILLANS, TORREY & HANAW, D. C. ANDERSON & SONS, and R. CHAPMAN, for appellant, cited *Lehman v. Lewis*, 62 Ala. 134; *Shelby v. Tardy*, 84 Ala. 329; *White v. Farley*, 81 Ala. 563; *Bibb v. Hunter*, 79 Ala. 351; *Rose v. Gibson*, 71 Ala. 35; *Edwards v. Rogers*, 81 Ala. 571; Perry on Trusts, §§ 133-7; 2 Pom. Equity, § 1038; 51 Amer. Dec. 756, *note; Botsford v. Burr*, 2 John. Ch. 408; *Patton v. Beecher*, 62 Ala. 579; *Baker v. Vining*, 50 Amer. Dec. 617.

A. G. SMITH, and T. B. & R. P. WETMORE, *contra*.

CLOPTON, J.—Mrs. Mitchell, appellee, seeks by the bill to have declared and established in her favor a resulting trust of the legal estate in the lands therein mentioned. A judgment had been obtained by Catherine Moore against Daniel Mitchell, the husband of complainant, in the United States Circuit Court at Mobile, for several thousand dollars, besides the costs of suit. The special averments, on which complainant claims that a trust results, are: "That on or about the 17th day of April, 1878, the said judgment against the said Daniel Mitchell was transferred to the said Augustus A. Winston, for the sum of $6,811.12, including costs of suit, which sum was derived by him from the proceeds of her statutory separate estate; and your oratrix alleges, that said transfer to said Winston was made to him as her agent, for the purpose of saving the lands of her husband, and buying the same in for herself, in case the same were sold under execution on said judgment, which said Winston well knew, agreeing to assist your oratrix in effecting that end, and advising her therein, and using her statutory separate estate therefor." The separate estate alluded to consisted of one hundred shares of the capital stock of the Gainesville National Bank, of the par value of one hundred dollars per share, which were given to her by her father in 1871. The bill further alleges, that the lands, which consisted of three several tracts, known as the "Patton tract," the "Harrison land," and the "Long, or Frost place," were sold by the marshal under an *alias* execution issued on the judgment, and were bought in by defendant, at the price of $4,572.50, who took the title to himself, as agent; that she furnished the money to pay for the judgment; that the lands were sold for the purpose of putting the title in her; and that defendant "bought, paid for, and got the title thereto as her agent and trustee, and by her said means."

[Winston v. Mitchell.]

It is manifest from its allegations, that the bill proceeds upon the theory, that defendant acted as the agent of complainant in purchasing the judgment, using the proceeds of her statutory separate estate to pay for the same, upon an agreement that he would advise and assist her in obtaining the lands for herself, in the event they were sold; and that, in pursuance of such agreement, he subsequently purchased them at the execution sale, used the judgment in paying for the same, and took the title in his own name as agent. It does not seek to establish a trust which results from the facts independent and exclusive of an agreement—a trust resulting by mere implication or construction of law. The trust claimed by complainant, if it exists, has its origin and foundation in the purchase of the judgment. It is therefore essential to sustain the case made by the bill, that complainant establish, by satisfactory proof, that defendant acted as her agent in the transaction, and purchased the judgment with the proceeds of her bank stock, under an agreement to bid off the lands for her benefit, if sold under an execution. In cases of this character, "a closer correspondence between the pleadings and proof is required than in any other, except the analogous cases of bills for the reformation, or for the specific performance of contracts."—*Patton v. Beecher*, 62 Ala. 579.

The first question, then, is, does the evidence sufficiently establish the special averments of the bill, on which complainant rests her title to relief? In the consideration of this question, we shall discard the oral evidence of the parties in respect to their intention, meaning, and understanding. Both concur that the agreement and understanding between them was all had by correspondence. All the letters which passed are professedly attached to their respective depositions, except some which were destroyed, the contents of which are not proved. The presumption is, that they were unimportant, otherwise they would have been preserved with those regarded valuable. From the correspondence, though not clear and explicit in some respects, considered in the light of the attendant and subsequent circumstances, we must ascertain, as satisfactorily as we may, the real facts and nature of the transaction.

A statement of a few indisputable facts is essential to a full understanding of some allusions in the letters, and of the relative positions occupied by the parties. Complainant and defendant bear to each other the relation of father and

[Winston v. Mitchell.]

daughter. He had become liable, either as indorser or acceptor, for the accommodation of her husband, on paper for large sums of money held by the Gainesville Bank, and by W. O. Winston; and her husband was also largely indebted to Jones & Co., and others. Their financial difficulties culminated on the affirmance of the judgment against Mitchell by the Supreme Court of the United States, defendant being surety on his *supersedeas* bond. As the collection of the judgment could be speedily enforced by levy and sale, prompt measures were requisite to prevent a sacrifice of property, and probable financial ruin. In this state of affairs, the correspondence commenced. As to the plan which should be adopted, and the arrangements made to meet the emergencies, the parties differed totally in their views. Complainant's proposals are expressed in her letter of March 13, 1878, evidently in reply to one written by defendant, not produced. Impressed with the fact that her husband could never pay his indebtedness, nor even the interest, she urged her father to sell her bank stock, pay the debt due to the bank and W. O. Winston, for which he was liable, and secure himself, as to the judgment, by the Patton tract and other lands; and this being done, she hoped that, by economy, they would be able to pay Jones & Co., and eventually work out of debt. Defendant's suggestions are contained in his letter of March 24th, 1878, in response to complainant's. They were, to borrow money by a pledge of her bank stock, pay the judgment and the Winston debt, and secure herself, for the use of her stock, by a mortgage on her husband's land; sell the lands at private sale, and save his indorsement and the stock. If this was agreed to, and they would send the notes and the numbers of the lands, he proposed to get an attorney to prepare the mortgage. Five days thereafter, he wrote another letter, in which he expressed apprehensions that Jones & Co. were endeavoring to get complainant to secure their debt, or let her stock go to pay the judgment. He reiterated his wish, that her stock, if used, should be secured by mortgage on the Patton tract, and urged, if she thought he would protect her, to let him have it fixed his way.

From the letter of defendant of April 1, 1878, addressed to Mitchell, it appears that two notes had been sent to him. For what purpose, must be collected from the following extracts: "I received the two notes, and no letter. I return the inclosed, for W. A. Gage to witness Martha A. Mitchell's

[Winston v. Mitchell.]

signature. Send the stock with this, as the bank stock is held with the notes, when used, and returned *paid*. Send land numbers, so I can secure Martha and children." After suggesting to Mitchell to obtain, at once, the amount of each dividend received on the stock, and give complainant a note for it, he adds: "All I wish is to secure Martha and children, and give you a chance to work out, without being sold out, or annoyed by J. W. Jones & Co. If attended to as I request, you will get time, and either sell or work out." It is evident from the letter of April 11, 1878, written by defendant to complainant, that the paper referred to as indorsed, was returned with complainant's indorsement, but without an accompanying letter. In this last letter, defendant writes: "I wrote Mr. Mitchell and yourself at length, and no reply to-day. I received again, in a blank envelope, your indorsement, without one word. My child, I do not wish anything that you both do not approve of; it looks as though it was not agreeable, by the second letter, without a word of approval or dissent." The record contains another letter written by complainant, which defendant testifies was received two days after the date of the letter last mentioned, and which carries internal evidence that it was written about that time. She re-urges her proposals as to the settlement of the debts, and says that she is more than willing to give up her bank stock to relieve her father, and if he is not willing to her plan, he could do as he said, and she would have nothing more to say. With this, the correspondence is suspended for several months. The judgment was transferred to defendant, April 17, 1878.

We have fully considered this portion of the correspondence, and made the foregoing extracts, because the positions and views of the parties, immediately preceding the purchase of the judgment, would be thereby more manifest. We search in vain for any proposition, or any understanding, express or implied, upon which the minds of the parties met, looking to the purchase of the judgment by defendant, as agent of complainant, for the purpose of buying the land for her, if it was sold under execution. A sale under execution was not suggested by either; on the contrary, in his letter of March 15th, 1878, defendant expressed his decided objection to a sale by the marshal, on the ground that a sacrifice of the property and ruin of Mitchell's credit would be the consequence. The prominent wish of complainant was to relieve her father from liability, to accomplish which she was

26

[Winston v. Mitchell.]

willing to give up her bank stock; and defendant not only sought this, but also desired that she should be secured, if she pledged her stock. Neither proposed or suggested a purchase of the judgment for any ulterior purpose of benefit to complainant, but its payment, and her security by a mortgage on the land. Her stock was not then or subsequently sold, as will be hereafter shown; hence its proceeds could not have been used in purchasing the judgment, at the time it was purchased.

It is insisted, however, that the defendant's plan for arranging the debts was substantially carried out, by borrowing money by pledge of complainant's stock, and the judgment held open as complainant's security, instead of a mortgage on the lands. This inference is founded on the fact, that the original certificate, which was in the name of Mitchell, as trustee, was surrendered April 8, 1878, and new certificates issued in the name of Mrs. Mitchell; and on the admissions of defendant in subsequent letters, written by him to complainant, on February 11 and 20, 1879; such as: "The debt to the Savings Bank with you and your stock pledged, I promised Smith L. & Co. to see their debt paid;" and, "Your bank stock was put in your name, and by you pledged to raise money to pay U. S. court debt." It must be admitted that the change of the certificates at that particular time, and the admissions referred to, strongly sustain the reasonableness of the inference; and in the absence of evidence showing that the stock was *not* in fact pledged at that time, we should regard the inference as irresistible. It may be, that in the letters the defendant referred to the paper which he returned in his letter of April 1, 1878, which it is probable had some connection with, or relation to a pledge of the stock, and which he regarded as a pledge. Be this as it may, it is manifest from the negative and positive evidence, that the certificates of stock had not been sent, and were not in the possession of defendant at the time he took a transfer of the judgment. His letter of April 11, 1878, in which he acknowledged the receipt of complainant's indorsement—that is, the paper which he had inclosed in his previous letter—is silent as to the stock, and evidently expresses disappointment at not receiving an approval or dissent from his plan. He testifies that the certificates were not sent; and complainant and her husband, not only omit to testify that they were sent at that time, but directly and positively testify that they were, in fact, sent

[Winston v. Mitchell.]

subsequently. The evidence of complainant is, that the note for $6,400, which was signed by her and her husband, dated April 15, 1879, and payable to the order of defendant twelve months after date, was given to pay off the judgment, and when the judgment was paid, she was to have the lands, and that the certificates of stock were sent to the defendant at the time she signed this note. The evidence of her husband is substantially to the same effect. If this evidence be true, and complainant and her husband certainly know when the certificate was sent, it was not placed in the defendant's possession until about one year after the judgment was purchased; so that the money used in purchasing the judgment could not have been raised by a pledge of the stock, in law or in fact.

But, were it conceded that her stock was pledged to borrow money for the purpose, complainant, being under the disabilities of coverture, was incapable, under the statute in force at that time, to contract a debt for the loan of money, binding her personally, or her separate estate; and if the defendant agreed or promised to take a transfer of the judgment, and use it in purchasing the lands for her benefit, such agreement or promise could not be enforced, for the want of mutuality.—*Lehman v. Lewis,* 62 Ala. 129. If, however, the money was thus raised, or was advanced by defendant for complainant, and he was subsequently re-imbursed from the proceeds of her separate estate, he would be estopped to set up the want of mutuality. Without a review in detail, the evidence convinces us, that the money, with which the judgment was purchased, was borrowed by request of complainant, or advanced by defendant, having in view both his own protection and the benefit of his daughter and her children. His declaration is: "The U. S. debt was paid from money borrowed at your request, and the bank stock was sold to pay that money back to the Savings Bank."

The note for $6,400 was evidently given for the purpose of re-imbursing defendant, not to pay off the judgment, and was paid with proceeds of complainant's bank stock. It is true that Woodruff testifies, and the receipts of defendant show, that on closing the affairs of the bank, the amount distributed to complainant on account of her stock, was applied to the payment of the paper of Mitchell indorsed by defendant, and held by the bank, in January, 1880, and charged to defendant's accounts on the books of the bank.

[Winston v. Mitchell.]

On March 1, 1880, defendant receipted the National Commercial Bank for $6,400, on account of eighty shares of complainant's stock in the Gainesville Bank. The note for $6,400 matured about two weeks thereafter, and across the face of it is written, in defendant's handwriting, "Paid by 80 shares, $6,400 of it Martha A. Mitchell, Gainesville Bk. stock." This memorandum defendant neither denies, nor satisfactorily explains.

The National Commercial Bank was the disbursing agent of the Gainesville Bank in winding up its affairs, and the defendant was the president of the former bank. The memorandum on the note was made at a time when the facts were known, and fresh in recollection. From these facts, the inference is irresistible, that there was some unexplained connection between the settlement of Mitchell's notes with the Gainesville Bank and the payment of the note for $6,400. On this theory alone can the evidence be reconciled; otherwise, either the entry on the note and the declaration of the defendant, or the testimony of Woodruff and the recitals of the receipt, are false. The proceeds of the stock could not have been used to pay two separate and distinct debts, each equal or larger in amount. This transaction occurred before the sale of the lands, which was in June, 1881. Under these circumstances, complainant had an election, to make defendant and the bank personally liable for such unauthorized and illegal disposition of the proceeds of her stock, or to follow them into the lands, in purchasing which the judgment was used. Had the proceeds of her separate estate, thus used, been sufficient to repay or re-imburse defendant to the full amount borrowed or advanced by him, in the purchase of the judgment, a trust of the legal estate would result by implication of law. But complainant does not claim or pretend that she ever paid more than $6,400. This amount was less than the sum paid by defendant for the judgment, and was considerably less, if interest be calculated thereon until the maturity and payment of the note. A trust of the legal estate in the *entire* lands will not result, unless it is both averred and proved, that complainant paid the entire purchase-money of the judgment.—*Bibb v. Hunter*, 79 Ala. 351; *Preston v. McMillan*, 58 Ala. 84; *McGowan v. McGowan*, 74 Amer. Dec. 668. On the pleadings and proof, a trust of the entire legal estate does not result to complainant.

But it does not follow that complainant is without equity.

A constructive trust arises, when a trustee or an agent, either by agreement or by a breach of confidence, which chancery impresses with a trust *in invitum*, uses the funds of another in part purchase of, or part payment for property, and takes the title in his own name. In such case, the beneficiary is entitled to charge the property with the amount thus invested.—*Tilford v. Torrey*, 53 Ala. 120. Neither complainant, nor her husband, nor defendant, nor all together, were capable to appropriate the *corpus* of her separate estate to the payment of her husband's debts; and on account of such use of her funds chancery holds the defendant to be a trustee *in invitum*. Under the statute in force at the time of the transaction, her husband was the trustee of complainant's statutory separate estate, and entitled to receive and dispose of the income. It has been held, that when the wife seeks, by bill in equity, to charge lands with her funds used by her husband in their purchase, she was not entitled to recover interest.—*Sawyer v. Baker*, 77 Ala. 461. The reason of this rule ceased with the passage of the act "to define the rights and liabilities of husband and wife," approved February 28, 1887. By this statute, the trusteeship of the husband was abrogated, and the wife became entitled to sue for and recover the rents, income and profits of her separate estate. In such case, the equity of complainant is, to charge the lands with the sum of $6,400, with interest from February 28, 1887. It appears that defendant has executed a deed to complainant to the "Long place." If the parties agree that she may retain this land, its valuation should be deducted from the amount, and interest calculated on the balance. If they do not agree, the deed should be cancelled.

We have thus considered the equity of complainant in every aspect of the case as presented by the evidence, in the hope that there will be an amicable adjustment between the parties on the basis stated, or on some other equitable basis, and a litigation terminated, the continuance of which can only result in widening the estrangement between father and daughter, and fomenting domestic discord; evils, against which mere pecuniary considerations should not be allowed a feather's weight in the balance.

The cause will be remanded, that complainant may amend her bill, as she may be advised, to meet the state of the evidence; and defendant allowed to set up any defense which may be regarded available.

Reversed and remanded.